Stanley W. FOWLER, Plaintiff,

v.

Camille G. GRAHAM, Warden, Maximum Security Center; Johnny E. Johnson, Chief of Security, Maximum Security Center; Mr. Arehart, Asst. Supervisor, Maximum Security Center, Defendants.

Civ. A. No. 78-1767.

United States District Court,
D. South Carolina,
Columbia Division.

March 7, 1979.

Stanley W. Fowler, pro se.

Emmet H. Clair, Asst. Atty. Gen. for the State of S. C., Columbia, S. C., for defendants.

## ORDER

HEMPHILL, District Judge.

In this § 1983 case initiated by a state prisoner confined in the Maximum Security Center (MSC) of the South Carolina Department of Corrections (SCDC), two separate causes of action are alleged against three officials of the MSC. For a first cause of action, the plaintiff complains about the opening of a letter returned to him as unmailable during August of 1978 by defendant Ernest F. Arehart, an assistant correctional supervisor of the SCDC. For a second cause of action, he complains of body searches and daily shakedowns of his cell in MSC for the period commencing on July 19, 1978, and ending six days later.[1] The plaintiff requests damages from Arehart, the former Warden of MSC (Graham), and the chief correctional officer of MSC (Johnson), together with an injunction to restrain further incidents of the types he describes.[2]

The defendants have filed an answer and a motion for summary judgment. The motion is based on the pleadings and an affidavit by defendant Johnson, to which there are attached excerpts from the Inmate Guide, which states the correspondence policy affecting SCDC inmates, and a SCDC form 18–5, by use of which an inmate may request a change in his approved list of visitors or mail correspondents.

Johnson avers that the letter rejected for mailing was intended for a prisoner confined in a Georgia prison. The letter was inspected in accordance with established prison policy because it falls in a class of restricted correspondence which is subject to inspection, and because all communications intended for other inmates are read for security reasons at MSC. Johnson adds that plaintiff has not requested that the Georgia addressee of the letter be added to his list of approved correspondents, and that until this is done, and approval is entered on his record, the prison's policy prohibits the plaintiff from writing to the Georgia prisoner.

As for shakedowns and searches, Johnson avers that plaintiff's cell was shaken down

---

1. The complaint filed on October 11, 1978 was drafted by Calvin Mattison, a writwriter who has acquired a reputation in this district for consistently using the superlative grammatical degree in exaggerating the alleged constitutional claims submitted by him for himself and others.

2. The body searches are described in the complaint as "body cavity searches repeatedly without proper State compelling interest or provocation." The complaint does not state which defendant has conducted the cell searches and the body searches that he alleges have occurred.

in a routine, random shakedown at MSC on July 20, 1978, at 4:40 P.M. A second shakedown was called on July 25, 1978, on the basis of an informant's tip that plaintiff had a knife (shank) hidden in his cell. Although no shank was found, plaintiff flushed an unidentified object down the commode in his cell before officers entered, according to Johnson. The affiant categorically denies that "cavity" searches are made by correctional officers. According to Johnson, only medical personnel perform body cavity searches. During shakedowns at MSC, inmates are required to strip, and officers conduct skin searches to look for secreted contraband items, but no officer touches an inmate's body during these skin searches, which are described in the officer's affidavit.

The plaintiff has received an explanation of summary judgment procedure, and he has been given an opportunity to oppose the motion for summary judgment filed by the defendants. The explanation informed plaintiff of the pertinent provisions of Rule 12 and Rule 56, Federal Rules of Civil Procedure, and he has been alerted to the contingency of a dismissal of his action if the material filed by the defendants is not opposed adequately.[3]

■ The plaintiff's response, filed December 1, 1978, consists of his reply, an affidavit by inmate Albert D. Manley, and three affidavits by the plaintiff. Two of the plaintiff's affidavits, and Manley's, were sworn to on August 30, 1978, which date fell long before the complaint was filed, and obviously before the motion for summary judgment was served on the plaintiff. Therefore, these three affidavits cannot be considered as being responsive to the exhibits attached to the defendants' motion.[4] The reply adds no factual averments that are material to any issue involved in this case. The lengthy affidavit of the plaintiff, verified on November 29, 1978, as is the reply, contradicts the affidavit of defendant Johnson as to the frequency of the shakedowns between July 19th and July 25th, but all other averments of the plaintiff concern issues that were not raised in his complaint. The new matters raised include plaintiff's claim that his trial transcript was taken from him (with other property) when he was placed in MSC after he was recaptured following an escape, and that defendant Arehart has refused to return the transcript which plaintiff states he needs for "my appeal."[5] The remaining new matters raised in plaintiff's affidavit are his claim that officers at MSC grant other prisoners more favorable treatment than he receives, and a speculative claim that he and others who are required to wear handcuffs while out of their cells might be assaulted by other inmates who do not wear such restraints while doing cleaning work at MSC.[6]

The plaintiff avers that his cell was shaken down four times between July 19th and July 25th, not twice as defendant Johnson avers. Plaintiff avers that Arehart and two other officers not named searched his cell on July 19th, and left it in a state of

---

3. *Roseboro v. Garrison,* 528 F.2d 309 (4th Cir. 1975).

4. The August 30th affidavits are merely cumulative averments concerning the return of the opened letter to the plaintiff. In one of his affidavits, plaintiff avers that he had earlier sent a letter to the Georgia prisoner, one Suggs, and that the earlier mail had not been "stopped out front." Assuming this incident did occur, such error in not screening inmate correspondence as required by published prison policy would not authorize plaintiff to write Suggs again without a screening of his mail by prison officials under prison mail procedures set out in the Inmate Guide.

5. The plaintiff was convicted of armed robbery and larceny in 1974, according to the answer of the defendants. He states he escaped from Central Correctional Institution of the SCDC on October 31, 1976. It is highly unlikely that a direct appeal of the 1974 conviction would still be in a briefing stage now.

6. Plaintiff also argues that it is possible for a handcuffed inmate to be hurt on the recreation field because guards remove cuffs from one man at a time. Thus, he argues, "[A] person could be beat to death after the first man's handcuffs is taken off." He characterizes this procedure of removing handcuffs as "intrapment." This contention falls far short of stating a claim to be litigated under § 1983.

disarray. Officer Taylor checked it on July 20th with a metal detector. Officers Arehart, Jones and Finkley again shook his cell down on July 21st, and officers Sanders, Coleman and Miller followed up with another shakedown on July 23rd.[7]

According to the plaintiff, he attributes the shakedowns to an effort by officers to harass him so as to incite him to "trouble" he is "trying to avoid."

■ The plaintiff's belated claim about the transcript will have to be asserted in a new complaint. It is inappropriate to inject new matter into a case after issues are joined.[8] If, therefore, the plaintiff means to allege that his access to the courts is being denied by the withholding of his transcript, he is at liberty to submit a new complaint.[9] The remaining new matters set out in the November 29th affidavit do not involve matters which represent violations of the plaintiff's constitutional rights, considering his classification as an admitted escapee. A prisoner in maximum security has no right to unlimited telephone use, and plaintiff's allegation that other prisoners receive more favorable treatment than he receives does not present a constitutional issue.[10] As already observed, the wholly speculative allegation that the plaintiff could be assaulted by another inmate is not sufficient to state a claim under such authorities as *Woodhous v. Virginia*, 487 F.2d 889 (4th Cir. 1973), and *Gathercole v. Edwards*, No. 75–1615 (4th Cir., June 25, 1975).[11] If the plaintiff is apprehensive for his own personal safety when placed in contact with other prisoners, he should initiate a request through proper prison channels to be placed under protective custody. If, on the other hand, he knows of a specific inmate who has expressly threatened to harm him if given an opportunity to do so, plaintiff should inform the Warden of MSC of the identity of such person. In that event, the prison official *may* have an obligation to isolate the prisoner who has expressed the threat, if upon proper investigation the official determines that the threat appears to be more than an idle one.[12]

■ Reverting to the plaintiff's original claims about the single letter returned to him after being opened, cell shakedowns,

---

7. Taylor, Jones, Finkley, Sanders, Coleman and Miller are not named as defendants in this case.

8. In *Arey v. Turner*, No. 74–2360, and consolidated cases (4th Cir., May 17, 1975), a prisoner set out a new and separate cause of action in supplementary documents he submitted after issues had been joined in a civil rights case. A requirement that the new claim be asserted in a new complaint was affirmed on appeal. The Court of Appeals observed (page 16 of slip opinion), "A complaint once filed . . . should not be supplemented with new allegations." The Court added that such a course delays the case, disappoints the plaintiff, and causes unnecessary work by all concerned.

9. If another complaint is submitted for filing *in forma pauperis*, the plaintiff must allege facts that disclose at least the following information: (1) which case he is appealing; (2) the identity of his attorney, if any; (3) why he needs the transcript; (4) the status of the appeal, if known by him; (5) who has possession of the transcript; (6) whether SCDC officials have been told of the need for the transcript; (7) who has withheld the transcript from him, and any reason expressed for not letting him have the transcript; and (8) if he has an attorney, whether the attorney also has a copy of the transcript he can let the plaintiff borrow, if necessary. Any defendant named in such complaint must be linked by plaintiff specifically to any claim that the transcript is being unlawfully withheld from him.

10. To the extent that the plaintiff seems to be speaking for other inmates in MSC, his claims are superfluous. He cannot assert the constitutional rights of other prisoners. *Rich v. North Carolina Department*, No. 74–1748 (4th Cir., May 6, 1975).

11. In *Gathercole v. Edwards*, the Court of Appeals pointed out that, in order to hold a correctional officer liable under § 1983 for an injury inflicted upon a prisoner by another prisoner, the officer's failure to restrain the attacker must be the result of either gross negligence, or such a deliberate indifference to the injured prisoner's safety as to represent maliciousness.

12. " * * * While there is no right to absolute freedom from assaults while in prison, where an inmate has been identified as unusually dangerous, we think there is a duty devolving upon those with the requisite authority to isolate that prisoner from the general population. . . ." *Lowe v. Garrison*, No. 75–1739 (4th Cir., December 14, 1976), page 6 of slip opinion.

and body searches, only the last mentioned claim requires more than a summary rejection. Mail to and from prisoners, sent or received by other prisoners, does not have the same strong protection from scrutiny under the First Amendment that other mail receives. Prison authorities may execute the compelling state interest in security by screening inmate to inmate correspondence. *O'Connor v. Dixon*, 588 F.2d 1350 (4th Cir., 1978); *Williams v. Ward*, 404 F.Supp. 170 (S.D.N.Y.1975).[13] As to the requirement for the plaintiff to seek the addition of his alleged Georgia prisoner-correspondent to his approved list of correspondents, such requirement is reasonable, and no constitutional issue is raised by the procedure. The plaintiff's claim about the shakedowns of his cell in MSC is also lacking in merit. Numerous decisions in this district affirm the right of prison officials to conduct random shakedowns of cells in the South Carolina Department of Corrections. For example, in *Clay v. Martin*, Civil Action No. 77–338, Judge Simons wrote, in an Order filed on May 19, 1977:

> " * * * The claim of these two prisoners that they have a right to be free of a shakedown of their cells for contraband is unfounded. Shakedowns are a *sine qua non* of prison security and discipline, and the Fourth Amendment stops short of protecting a convicted felon's cell. *United States v. Robinson*, 506 F.2d 1398 (4th Cir. 1974); *United States v. Hitchcock*, 467 F.2d 1107 (9th Cir. 1972), *certiorari denied* 410 U.S. 916 [93 S.Ct. 973, 35 L.Ed.2d 279] (1973); *Hoitt v. Vitek*, 361 F.Supp. 1238, 1254–55 (N.H.1973), *aff'd*

*sub nom. Laaman v. Vitek*, 502 F.2d 1158 (1st Cir. 1973) . . . ."[14]

The Court of Appeals affirmed Judge Simons' conclusion on September 15, 1977, in *Clay and Samuels v. Martin, et al.*, No. 77–1897.

■ The large number of cases submitted to this Court by prisoners confined in the SCDC who complain of administrative punishment for possession of contraband attests the need for frequent shakedowns of cells at MSC, and other institutions in the system. These cases have revealed that prisoners will resort to numerous means to secrete contraband, and to traffic illegally in drugs, weapons, and other items of contraband. Frequent shakedowns to eliminate as much contraband as officers can discover do not offend a prisoner's constitutional rights.

As to body searches which are required in connection with shakedowns, it is established by the affidavits on file that plaintiff's claim of intrusive cavity searches is not valid. The plaintiff was given a clear opportunity to counter defendant Johnson's unequivocal statement that such searches are not conducted by non-medical personnel, and he has failed to respond to Johnson's averments as to body searches. Therefore, the Court will consider only the constitutionality of the type of body search, or strip search, described by the defendants. Johnson describes this as a search during which an inmate, unclothed, is required to open his mouth, shift his genitals, and spread his buttocks, so that officers may look at these areas of an inmate's body to see if contraband is visible.[15] According to

---

13. In *O'Connor v. Dixon*, at page 2 of the slip opinion, the Court of Appeals stated: " * * * [I]nmate to inmate correspondence simply is not entitled to the same constitutional protections accorded to other prison mail. In order to maintain prison security, prison authorities are warranted in screening mail sent between prisoners in different institutions. *See McCloskey v. Maryland*, 337 F.2d 72, 74 (4th Cir. 1964); *Lawrence v. Davis*, 401 F.Supp. 1203, 1205 (E.D.Va.1975) . . . ."

14. *United States v. Robinson* is an unpublished case, No. 73–2487, decided October 23, 1974. In that case, a federal prisoner insisted upon a

right to be present during a shakedown search of his cell. When prison officers sought to remove him, he forcibly resisted. He was convicted of assault. On appeal, he contended he had a right to resist an unlawful search of the cell, which was his "home." The Court of Appeals held that the analogy was improper, and that a prisoner's cell is not his "castle."

15. Similar searches of maximum security prisoners in New York and New Jersey have been injoined. See, e. g., *Hodges v. Klein*, 412 F.Supp. 896 (D.N.J.1976); *Frazier v. Ward*, 426 F.Supp. 1354 (N.D.N.Y.1977); and *Hurley v. Ward*, 448 F.Supp. 1227 (S.D.N.Y.1978). The

Johnson, "No officer places his hands on the inmate during such a search," and if an intrusive search of a body cavity is considered necessary, "It is the policy of the Department of Corrections to have medical personnel perform [such] searches." Johnson emphasizes that no exceptions are made at MSC in following this policy.

 This Court experiences no difficulty in reaching the conclusion that the policy of random shakedowns in the Maximum Security Center is fully justified, and for the reason stated by Johnson, i. e., to deter those prisoners who might violate contraband laws and rules. The requirement for an inmate to undress and to be secured by handcuffs while his cell is shaken down is also a reasonable requirement in a maximum security enclave. The safety of the officers involved in the shakedown presents a compelling state interest, and a search of a prisoner's clothing is facilitated by such a requirement. However, the record before the Court does not reveal a readily apparent justification for MSC officers to utilize the technique described by Chief Johnson in conducting the contemporaneous strip searches of MSC inmates whose cells are shaken down. While it may be possible for inmates to secrete contraband in their mouths, genitals, or in the area of their rumps, no facts are averred to reveal any relationship between this type of *repetitious* search and past instances involving the discovery of contraband hidden in the mouths or the groin areas of inmates' bodies. Unless such search techniques can be justified by experience, the procedure is vulnerable to criticism as a violation of the rights of the affected prisoners.[16]

The Court is not unmindful of the fact that a number of incorrigible prisoners are confined in MSC, and that the defendants may very well believe that the strip searches employed at MSC are required in the interests of security and discipline. Certainly, if the risk of a real and present danger to any officers (or other inmates) can be substantially eliminated by a continuation of the techniques described by defendant Johnson, the personal rights of inmates who are searched must yield to the necessity to eliminate the danger. However, the converse of this proposition is also a factor that must be evaluated. Unless it can be shown that an identifiable risk to the safety and security of MSC is eliminated or reduced by a visual rectal and testicle examination of every inmate whose cell is shaken down during random searches, the "degrading and dehumanizing examinations," to use terms employed in other cases, serve no logical penological end that this Court can discern.

In the absence of any known decision by the Court of Appeals for this circuit on the issue involved, the logic of each of Judge Fisher's conclusions in *Hodges v. Klein, supra*, is persuasive. In that case, maximum security prisoners in the Trenton State Prison were required to submit to the same type of visual examinations required in MSC. Such visual anal and genital examinations occurred when a prisoner entered or left the institution, following a contact visit with relatives or friends, and following each exercise period and after using a telephone away from the maximum security unit. Judge Fisher held that the conduct of a strip search (unclothing) was a matter that rested wholly within the discretion of prison officials, but he concluded that the "anal inspection aspect of the strip search" presented a constitutional issue under the Eighth Amendment. On the basis of facts concerning the activities in that prison, he concluded that such searches of prisoners entering or leaving the compound, and fol-

searches criticized in these cases were searches which were not justified by pragmatic security considerations in the opinions of Judge Fisher, Chief Judge Foley, and Judge Carter, respectively. The first two cases cited were class actions, and extensive hearings occurred in all three cases before the opinions were rendered. See also cases cited by Giannelli and Gilligan, *Prison Searches and Seizures*, 62 Va.L.Rev. 1045, 1084–86.

**16.** One expert witness testified before Chief Judge Foley in *Frazier v. Ward* that the type of rectal search here involved was as degrading to the officers as to the prisoners. 426 F.Supp. at 1365.

lowing contact visits, did not violate the rights of the prisoners. In those instances, he found that the state's interests in maintaining security and preserving discipline outweighed the prisoners' interests. In all other cases, however, he concluded that such a search could not be constitutionally justified unless an officer had received a reasonably clear indication or suggestion that the inmate to be searched had contraband concealed in his anal cavity. In such an instance, Judge Fisher drew upon the analogy of a border search by a customs officer, which requires only a reasonable suspicion, rather than probable cause, in order to effect an intrusive search.[17]

*Hurley v. Ward, supra,* is not as well documented as Judge Fisher's opinion, but it brings out one point that has a certain persuasive effect. That point is the observation of Judge Carter that searches such as are here in issue cannot be justified unless officers can reveal a history of discovering contraband in the private areas of prisoners' bodies.[18]

For the foregoing reasons, the Court is unable to dispose of the strip search issue in this case at this time without further elaboration of the facts. To the end of supplying that elaboration, the defendants are directed to supplement Johnson's affidavit within thirty (30) days of the date this Order is filed. Such supplement may take the form of further affidavits, or any other exhibits, that will tend to show, or show, why the defendants believe that strip searches of MSC inmates during every shakedown, by examining genital and rectal areas, are required to maintain security. If records have been kept concerning the discovery of contraband hidden in these areas of the bodies of MSC inmates, such records should be filed.[19]

IT IS SO ORDERED.

17. There are factual dissimilarities between *Hodges v. Klein* and the instant case. For one example, officers in Trenton sometimes touched the prisoners, whereas defendant Johnson avers this is never done at MSC. Despite some minor differences, the holding of Judge Fisher is persuasive here insofar as he discusses anal searches that cannot be justified unless it could be shown that such searches would stop the intra-prison flow of contraband, or that such searches would protect prison officers. Thus, at MSC, unless a prisoner has been where he could obtain contraband since the last shakedown of his cell, it is difficult to see the justification for a repetitious visual search of his rectal and genital parts.

18. In that case, the court found that the discovery of one marijuana cigarette in eight years did not justify searches of the genitals and the anal area of a maximum security prisoner. Two other discoveries of contraband represented items that could have been found without an inspection of anal or genital areas.

19. After considering any supplemental material filed by the defendants, the Court will determine whether it will be necessary to schedule a hearing in this case, or refer it to a magistrate for hearing.

The plaintiff will receive an opportunity to respond to supplementary exhibits filed by the defendants, unless the Court decides that a hearing will be required.