STATE of Missouri, Respondent,

v.

Richard Dale RICHTER, Appellant.

No. 63353.

Supreme Court of Missouri, en banc.

March 29, 1983.

514

Gerald D. McBeth, Bradford L. Pittenger, Nevada, for appellant.

John Ashcroft, Atty. Gen., William K. Haas, Asst. Atty. Gen., Jefferson City, for respondent.

PER CURIAM:

This appeal was heard in Division One of this Court where an opinion was prepared by Morgan, P.J. The cause was reheard by the Court en banc and the opinion by Mor-gan, P.J., is adopted as the decision of the Court en banc. The opinion is set forth without use of quotations:

Defendant Richard Dale Richter was found guilty by a jury of two counts of murder second degree, section 565.004, RSMo 1978, and was sentenced to imprisonment for life on one count and twenty years on the other with the sentences to be served consecutively. Because of the life sentence imposed, this Court has exclusive appellate jurisdiction. Mo. Const. art. V, § 3.

On the afternoon of December 13, 1980, Clester Parks saw black smoke rising from under the Panther Creek Bridge near Rockville, Missouri. There was a Buick Skylark parked on the side of the bridge, and Parks wrote down its license plate number on a piece of paper. Irvin Isaacon arrived at the bridge shortly thereafter. At that time, a man came off the bridge and Parks asked the man what happened. He replied, "I started a little fire." The man did not say anything further but shielded his face with his coat, slammed his trunk lid, jumped in the car and drove off. As the man drove by, Isaacon looked at him. Isaacon identified the man as defendant.

When Isaacon walked down to the fire, he discovered two bodies on a burning mattress. He pulled the bodies out of the fire and poured water on them. Parks gave Isaacon the piece of paper with the license plate number on it. By then, Ed Hooper had arrived at the scene. He gave Isaacon a ride into Rockville to call the Bates County Sheriff's Department where he reported the license number.

Dennis Davis, a deputy sheriff of Bates County, received the call from Isaacon and Hooper. The license plate number belonged to defendant. Deputy Davis was present at the autopsies conducted on the two victims, Donnie and Tommy Burns, and testified that several photographs taken at the autopsies were fair and accurate.

Dr. Upsher, a specialist in pathology, conducted the autopsies on the Burns brothers. He concluded that death was due to massive skull fractures; Tommy dying almost

instantly, and Donnie in a matter of minutes.

On December 14, 1980, Terry Davis, a deputy sheriff of Vernon County, proceeded to a location west of Schell City on AA Highway in Vernon County. He observed blood, hair, and clothing in a 255-foot stretch of blacktop.

On December 15, 1980, Deputy Davis and Sergeant Ullery of the Highway Patrol were transporting defendant from the Bates County Jail to Lee's Summit, Missouri, to question him. Defendant indicated that he wanted to make a statement.

After being advised of his *Miranda* rights, defendant made an oral statement to Deputy Davis and Sergeant Ullery. A summary of the notes taken by Davis follows: On Thursday evening, December 11, 1980, defendant and his former wife, Cathy Shoemaker, who were now living together with their three children, were talking about Tommy Burns having raped a little girl in Butler, Missouri. Defendant's seven-year-old daughter, Stacey, told them that Donnie Burns had raped her once when he was baby-sitting. Defendant and Stacey went looking for Donnie that night. On Friday, December 12, 1980, defendant and his brother, Gary Richter, saw Donnie and Tommy and the four went riding around together. They went to defendant's parents' home. When defendant told his father what had happened, his father said to take the Burns brothers to the police. Defendant stated that he took Gary home and then drove out to AA Highway and stopped. He told Donnie to get out because he wanted to talk with him. Defendant got the tire bat from under the seat and took Donnie to the back of the car. Defendant asked Donnie what happened and when he told him, defendant hit him repeatedly and "could not stop." Then Tommy got out of the car and told defendant to quit. Defendant ran Tommy down while hitting him. Defendant then ran over them with his automobile, forwards and backwards, several times. Defendant stated that when he came to his senses, he loaded Donnie and Tommy into the car and dumped them out by the bridge. Defendant burned the bloodstained things. He later returned to the bridge and set the bodies on fire. Defendant admitted that the Burns brothers never fought back.

Sergeant Ullery testified that on December 15, 1980, after returning to the Bates County Jail, defendant made a written statement after being advised of his *Miranda* rights. This statement was substantially the same as the oral statement made to both Sergeant Ullery and Deputy Davis; however, defendant added that when his father told him to take the Burns brothers to the police, defendant said he "was going to beat the hell out of him first."

Leonard Hough, Sheriff of Bates County, interviewed defendant on December 17, 1980, at the Vernon County Jail. He advised defendant of his *Miranda* rights [1] and advised defendant that Mr. Smith had been appointed as his attorney.[2] Defendant said he did not request the attorney's presence during the statement. Defendant made a written statement very similar to the two statements made on December 15, 1980, except that in this statement defendant admitted that his brother Gary was present at the time of the killings and had yelled to defendant to "please stop, don't kill them." Sheriff Hough also testified that defendant told him that he used a "tire knocker" to kill Tommy and Donnie Burns. Defendant described the tire knocker as a heavy piece of hard wood that he got at a truck stop which was used to beat trailer truck tires to check air pressure.

---

1. The Sheriff orally advised defendant of his constitutional rights. Also, the statement given by defendant began with the complete *Miranda* warnings. The Sheriff read the warnings to defendant, who also read them. Defendant did not appear to be intoxicated, under the influence of drugs, or mentally retarded.

2. Defendant was arrested and charged with capital murder on December 14, 1980. On December 15, 1980, he was arraigned and the court appointed defense counsel by mail in a letter dated December 16, 1980. Counsel received that letter the following day.

On May 8, 1981, defendant, while incarcerated at the Vernon County Jail, asked Don Loiselle, a jailer, to deliver a letter to Gary Richter, who was also confined at the jail. The letter was written on regular tablet paper. It was not sealed in an envelope or addressed. It had the name "Gary" on the outside. Loiselle took the letter, briefly reviewed it, and gave it to Robert Gast, Sheriff of Vernon County.

Sheriff Gast gave the original letter back to defendant, but retained a photocopy. One part of the letter recited that "the night I killed those two, of course you had no idea I was going to kill them and in fact you didn't even know I was mad at them . . . ."

Defendant's sole defense was mental disease or defect excluding responsibility. Dr. Richard M. Childs, a psychiatrist, testified that defendant had a "very primitive personality, with brittle defenses and vulnerability to being overwhelmed by emotional feelings and enraged reaction." Dr. Childs further testified that defendant, after learning of the rape of his daughter, largely had the mental capacity to consider taking the lives of the Burns brothers and to reflect coolly and calmly before doing so. Defendant told the doctor that he had thought of killing them but it was not his plan to do so. Dr. Childs also testified that he did not believe that defendant planned to do so at that time. In his opinion, the key that ultimately set defendant off was when Donnie told him what he had done and at that time defendant was not able to reflect coolly on the matter. On cross-examination, Dr. Childs stated that he diagnosed defendant as having a "personality disorder, other," and that such a disorder constituted a mental disease or defect.

Over defendant's objection, the state was permitted to call Dr. Frank Schoolcraft, a psychiatrist, as a rebuttal witness. Dr. Schoolcraft had not been disclosed to defendant. He testified that a "personality disorder, other" was not a mental disease or defect.

## I.

■ Defendant contends that the trial court erred in striking three jurors for cause because of their opinions concerning the death penalty. Defendant relies upon *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968), which held:

> a *sentence of death* cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to death penalty or expressed conscientious or religious scruples against its infliction. No defendant can constitutionally be *put to death* at the hands of a tribunal so selected.

391 U.S. at 522–23, 88 S.Ct. at 1777 (Emphasis added and footnotes omitted).

However, it is clear that the *Witherspoon* holding only applies when a sentence of death is returned by the jury. *Id.* at 522 n. 21, 88 S.Ct. at 1777 n. 21; *Bumper v. North Carolina*, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968). Missouri follows this rule. *State v. Mitchell*, 611 S.W.2d 223, 228 & n. 5 (Mo. banc 1981). Since the jury did not return a death verdict in the present case, *Witherspoon* does not apply.

## II.

■ Defendant contends that the trial court erred in omitting the penalty provisions in the verdict directing instructions on manslaughter and second degree murder. Essentially, defendant argues that the penalty provisions should be included in the appropriate instructions when capital murder is submitted as a higher homicide.

Defendant concedes that the instructions as given were in compliance with the directives of MAI–CR2d. In particular, Note 5 of the Notes on Use to MAI–CR2d 15.18 [Manslaughter: Conventional] and Note 6 of the Notes on Use to MAI–CR2d 15.14 [Murder: Second Degree, Conventional] direct that if capital murder is submitted as a higher homicide, submission of punishment in MAI–CR2d 15.14 (and 15.18) is to be omitted. This directive is based on section 565.006, RSMo Supp.1981, which provides in

pertinent part: "At the conclusion of all trials upon an indictment or information for capital murder heard by a jury, and after argument of counsel and proper charge from the court, the jury shall retire to consider a verdict of guilty or not guilty without any consideration of punishment."

Nevertheless, defendant argues that had the penalty provisions for manslaughter and murder second degree been included, the jurors would have had the opportunity to assess the potential sentence that might be accorded to defendant, and this possibly could have affected their decisions as to what crime they ultimately found defendant had committed.[3]

Under the circumstances, we have looked for any possible prejudice to defendant and can find none. The jury under the authority given to it found defendant guilty of murder second degree on both counts, and assessed defendant's punishment at twenty years and life—substantially higher than the maximum allowable punishment for manslaughter (ten years) and the minimum allowable punishment for murder second degree (ten years). Thus, it cannot be argued reasonably that the jury would have convicted defendant of manslaughter in order to give him a lesser sentence than that permitted for a conviction of second degree murder.

Consequently, we conclude that the trial court did not err by omitting the punishment sections on the lesser homicide instructions and that no prejudice resulted.

### III.

Defendant contends that there was insufficient evidence of intent to support a submission or a finding of guilty of murder second degree.

■ In reviewing the record we accept as true all evidence tending to prove defendant guilty together with all reasonable inferences supportive of the verdict. *State*

v. *Brooks,* 618 S.W.2d 22, 23 (Mo. banc 1981). Intent may be inferred from the circumstances surrounding the killing, including the nature of the weapon used, the manner of using it, and the results of its use. *State v. Woolford,* 545 S.W.2d 367, 371 (Mo.App.1977). Furthermore, evidence on the part of the state of a killing by the use of a deadly weapon on a vital part of the body of the victim is sufficient to permit a finding of intent to kill. *State v. Ward,* 569 S.W.2d 341, 344 (Mo.App.1978).

■ Under the foregoing principles, the proof, as set forth initially in this opinion, was clearly sufficient to sustain the jury's finding that defendant intended to take the lives of the Burns brothers.

### IV.

Defendant contends that the trial court erred in denying the motion to suppress his December 17, 1980, statement taken by Sheriff Hough because "counsel had been appointed for [defendant] but was not present at the time of the taking of the statement and the testimony of Hough concerning the circumstances surrounding the taking of the statement is so contradictory that all of his testimony becomes incredible and unworthy of belief." Defendant's argument is essentially two-fold: (1) The use of the confession was erroneous because it was taken without presence of counsel after counsel had been appointed; and (2) Conflict between Hough's testimony at the preliminary hearing and later during the suppression hearing, with respect to whether Hough was aware of defense counsel's appointment and so informed defendant at the time of interrogation, makes his testimony regarding the voluntariness of the confession not worthy of belief.

■ With regard to defendant's first argument, the cases indicate that a defendant may waive his right to counsel without con-

---

**3.** This argument assumes that the jury would have ignored the court's instructions to find defendant guilty of the higher offense even though it had found that the state had proven beyond a reasonable doubt all of the elements of the higher defense. We cannot accept this assumption.

sulting his attorney.[4]  *State v. Chandler,* 605 S.W.2d 100, 113–15 (Mo. banc 1980); *State v. McConnell,* 529 S.W.2d 185, 187–88 (Mo.App.1975).[5]  Consequently, defendant's first argument is rejected.

■ As to the inconsistency in Sheriff Hough's testimony, it is important to note that in reviewing the trial court's determination on the motion to suppress, the weight of the evidence and credibility of witnesses are questions for the trial court's resolution. *State v. Boggs,* 634 S.W.2d 447 (Mo. banc 1982); *State v. Hahn,* 618 S.W.2d 435 (Mo.1981).  Our examination of the record suggests that Sheriff Hough (or the prosecutor) was confused as to the day of the particular statement, in light of the fact that at least three statements were obtained from defendant in close proximity to each other.  Therefore, deferring to the trial court's determination of the weight of the evidence and credibility of Sheriff Hough, we conclude that there was ample evidence that defendant intentionally relinquished or abandoned a known right or privilege and did so voluntarily.

### V.

■ Defendant contends that the trial court erred in overruling defendant's motion to suppress the letter written by defendant to his brother Gary (while Gary was also in the Vernon County Jail) because the letter was obtained by trickery, deceit, and falsehood.  Specifically, defendant argues that Don Loiselle, the jailer, led defendant to believe that his notes were being delivered to his brother and that their privacy was being respected.

As an aid in the prevention of escapes, it was the policy at the jail to screen letters passed between cells.  In fact, defendant, at the time of being checked in, signed a form authorizing the censoring of his mail by the jail authorities.  Furthermore, Loiselle never told defendant that he would take the letter to Gary without anyone seeing it.  We are not inclined to say that defendant had any expectations of privacy.  "Mail to and from prisoners, sent or received by other prisoners, does not have the same strong protection from scrutiny under the First Amendment that other mail receives.  Prison authorities may execute the compelling state interest in security by screening inmate to inmate correspondence." *Fowler v. Graham,* 478 F.Supp. 90, 94 (D.S.C.1979).

Based on the foregoing and because there is no indication that this letter (and its contents) were deliberately elicited from defendant, we hold that the trial court was correct in denying defendant's motion to suppress.

4. It is important to note that we are not faced with a situation where the accused has expressed his desire to deal with the police only through counsel, so that he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges or conversations with the police." *Edwards v. Arizona,* 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); *State v. Oldham,* 618 S.W.2d 647 (Mo. banc 1981).

5. In *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977), the so-called "Christian burial speech" case, the Court suggested that a defendant may waive his right to counsel, after it has attached, without notice to or consultation with counsel. 430 U.S. at 405–06, 97 S.Ct. at 1243.  *Brewer* has been interpreted to support this view. *United States v. Rodriguez-Gastelum,* 569 F.2d 482, 488 (9th Cir.1978) (en banc), *cert. denied sub nom., Rodriguez-Gastelum v. United States,* 436 U.S. 919, 98 S.Ct. 2266, 56 L.Ed.2d 760 (1978);

*Stringer v. State,* 372 So.2d 378, 382–83 (Ala. Crim.App.1979); *Shreeves v. United States,* 395 A.2d 774, 781 (D.C.1978), *cert. denied,* 441 U.S. 943, 99 S.Ct. 2161, 60 L.Ed.2d 1045 (1979); *Watson v. State,* 282 Md. 73, 382 A.2d 574, 579–80, *cert. denied sub nom., Watson v. Maryland,* 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140 (1978); *People v. Green,* 405 Mich. 273, 274 N.W.2d 448, 455 (1979); *State v. Attebery,* 39 Or.App. 141, 591 P.2d 409, 411 (1979); *State v. Cline,* 405 A.2d 1192, 1199–1200 (R.I.1979).  *See United States v. Brown,* 569 F.2d 236, 239 (5th Cir.1978) (en banc).

Prior to *Brewer,* several decisions of the circuit courts of appeal upheld against a sixth amendment challenge convictions obtained through the use of incriminating statements made by an accused who was represented by counsel but interrogated in the absence of counsel. *See, e.g., United States v. Reynolds,* 496 F.2d 158, 162 (6th Cir.1974); *Moore v. Wolff,* 495 F.2d 35, 37 (8th Cir.1974).

## VI.

■ Defendant contends that certain photographs should not have been admitted into evidence. However, the photographs complained of were not included in the record on appeal. Thus, there is nothing for this Court to review because defendant has not fulfilled his duty of seeing to it that a complete record is filed. *State v. Jones,* 594 S.W.2d 932, 935 (Mo.1980); *State v. Wandix,* 624 S.W.2d 111, 113 (Mo.App.1981); *see* Rule 30.05.

## VII.

■ Defendant contends that the trial court erred in failing to declare a mistrial because the prosecutor "flagrantly" waved a "tire knocker" in the presence of the jury, which had not been admitted into evidence, and was not admissible because it lacked probative value and thus was prejudicial.

Defendant's counsel asked to make a record that the prosecutor had deliberately, blatantly, and flagrantly waved the object before the jury, and requested a mistrial. The trial court replied that the object was handed to the court reporter to be marked as an exhibit, that the jury did see it, but that he did not see any great waving. Pursuant to defendant's request, the trial court instructed the jury to disregard the last object which the state handed to the court reporter. Under these facts, it is difficult to say that the trial court abused its discretion.

## VIII.

Defendant contends that the trial court erred in allowing Dr. Schoolcraft to testify in rebuttal, the witness not being specifically disclosed by the state, because his testimony resulted in surprise to defendant. Defendant asserts that he was prejudiced because he was unable to adequately prepare and that permitting Dr. Schoolcraft to testify was fundamentally unfair. The state concedes that Dr. Schoolcraft was not disclosed but argues that prior to Dr. Childs' testimony that defendant's "primi-

tive and impulsive personality," which he termed a "personality disorder, other," was a mental disease or defect, the state had not intended to call Dr. Schoolcraft.

■ Regardless of whether the state was surprised at hearing Dr. Childs testify that defendant's personality disorder was a mental disease or defect, given the fact that the state had subpoened Dr. Schoolcraft earlier in the day, it is apparent that there was a partial failure to comply with the discovery rules. Rules 25.03 and 25.08.

Defendant argues that the state's failure to disclose is reversible error relying on *State v. Curtis,* 544 S.W.2d 580 (Mo. banc 1976). *Curtis* did hold that under the rules of criminal discovery it was reversible error to permit a psychiatrist to testify in rebuttal that defendant did not suffer from a mental disease or defect because "reciprocal discovery" requires that the state disclose the identity of persons it intends to call as rebuttal witnesses in notice-of-mental disease or defect defense situations. The rationale of *Curtis* was that " '[i]t is fundamentally unfair to require a defendant to divulge the details of his own case while at the same time subjecting him to the hazard of surprise concerning refutation of the very pieces of evidence which he disclosed to the State.' " *Id.* at 582 (quoting *Wardius v. Oregon,* 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973)).

As noted in *Curtis,* the purpose of "reciprocal discovery" is to prevent surprise. There, so far as the opinion reveals, the existence of the psychiatrist as a possible witness was unknown to defendant until the night before the trial, and "there was no opportunity afforded the defense [to arrange an interview, much less take a deposition.]" 544 S.W.2d at 581 (brackets added).

■ In the present case, although the existence of Dr. Schoolcraft was not revealed until the moment he was called to testify, the trial court granted defendant's request to interview Dr. Schoolcraft prior to his rebuttal testimony. A twenty minute recess was taken for this purpose.[6]

6. Defendant's requests for both one and two     day continuances were denied. It is without

Under the circumstances of this case, given the fact that the state was only permitted to ask Dr. Schoolcraft the *singular question* of whether defendant's disorder was a mental disease or defect, and defendant had twenty minutes to interview Dr. Schoolcraft with respect to that question, we conclude that the failure to exclude Dr. Schoolcraft from testifying or grant more time to interview him did not prejudice defendant, *see State v. Petree,* 568 S.W.2d 546, 548 (Mo.App.1978), nor did his testimony result in any fundamental unfairness. For these reasons, we find no abuse of discretion in the trial court's action.

### IX.

■ Defendant contends that the trial court erred in failing to grant a mistrial because of five acts of alleged prosecutorial misconduct which, when examined *in toto,* would require reversal.

Defendant's allegations regarding the waving of the "tire knocker" and the surprise testimony of Dr. Schoolcraft have been discussed. Of the remaining three allegations, the first involves the prosecutor's asking three witnesses what each of them would do if one of his little children was molested. Defendant objected to the question each time and the trial court sustained the objection before each witness could answer the prosecutor's question.

The second alleged act of misconduct involved the prosecutor speaking loud enough at bench conferences for the jury to hear. Defendant complained about this three times. However, what the jury heard was essentially nothing more than that the state would like to make an offer of proof. There is no indication that the jury heard the substance of the proposed offers.

The final allegation stems from the placing of a picture of Donnie Burns' crippled arm on the jury rail, which picture the trial court ruled should not be passed to the jury a second time. There was no showing that

question that the imposition of remedies lies within the sound discretion of the trial court. It is, however, an abuse of discretion to fail to impose a sanction where the violation of a

any member of the jury saw the photograph at the time. Nor is it clear that any prejudice could have resulted had it been seen, since the photograph had already been passed to the jury.

After carefully examining the record, we are convinced that there was no prosecutorial misconduct and that the cumulative effect of these actions did not prejudice defendant.

The judgment is affirmed.

WELLIVER, HIGGINS, GUNN, BILLINGS and DONNELLY, JJ., concur.

BLACKMAR, J., concurs in separate opinion.

RENDLEN, C.J., concurs and concurs in separate opinion of BLACKMAR, J.

BLACKMAR, Judge, concurring.

I concur. I must, however, express my strong disapproval of the prosecution's conduct in failing to disclose its rebuttal witness, Dr. Schoolcraft, until "the moment he was called to testify." Such tactics are discourteous and strain—if not transgress—the bounds of Rule 25.03. That rule provides that

> the state shall ... disclose to defendant's counsel ... (1) The names and last known addresses of persons whom the state intends to call as witnesses at ... trial ...

Here, the prosecution had subpoenaed the rebuttal witness several hours before he was called, and had contacted him concerning his testimony several days before he was called. Although the issue to which the witness' expertise would be applied was raised only by the prosecution in cross-examination, the record shows that the prosecution had at least tentative plans to call that witness in plenty of time to dis-

discovery rule results in fundamental unfairness or prejudice to the defendant. *State v. Royal,* 610 S.W.2d 946, 951 (Mo. banc 1980).

close those plans to the defense, as required by Rules 25.03 and 25.08.[1]

That issue was whether Dr. Childs' testimony that defendant's "personality disorder, other" amounted to a "mental disease or defect" and therefore would have supported an acquittal. Dr. Childs, on cross-examination, testified that the disorder *was* mental disease or defect. Whether defendant suffered prejudice because defense counsel was refused one or two days adjournment to prepare for Dr. Schoolcraft's refutation of Dr. Childs' testimony is the issue before this Court. I agree with the Court's conclusion that the trial court's refusal to grant the extra time did not prejudice defendant nor result in fundamental unfairness. Defense counsel never demonstrated that the extra days were essential to his case, and as the trial court observed, one doesn't need two days simply to look in the medical books and see whether a "personality disorder, other" is a defect or not. The allotted twenty minutes seems ample for an interview of Dr. Schoolcraft regarding the limited issue he was to address. Defense counsel, furthermore, had the immediate opportunity upon redirect examination of Dr. Childs to develop his answer given in cross-examination.

Defense counsel, on motion for new trial, did not file affidavits of any additional information which might have been presented at the trial had the requested adjournment been granted. If there had been any actual prejudice it could have been shown in this way. For want of further information, I am persuaded that twenty was plenty.

I concur in the per curiam opinion.

---

1. Rule 25.08 states,

    If subsequent to complying with a request for disclosure or order of court, a party discovers information which he would have been required to disclose under the request or order, he shall furnish such additional information to opposing counsel, and if the additions are discovered during trial, the court also shall be notified.