STATE of Missouri, Respondent,

v.

Joseph Nicholas BECK, Appellant.

No. 65915.

Supreme Court of Missouri,
En Banc.

Feb. 26, 1985.
As Modified April 2, 1985.
Rehearing Denied April 2, 1985.

Timothy A. Braun, Christine Miller Hendrix, St. Charles, for appellant.

John Ashcroft, Atty. Gen., John M. Morris, Asst. Atty. Gen., Jefferson City, for respondent.

BILLINGS, Judge.

Defendant Joseph Nicholas Beck was convicted of two counts of capital murder under § 565.001, RSMo 1978 and sentenced to two consecutive terms of life imprisonment. The Missouri Court of Appeals, Eastern District, reversed the judgment. We granted transfer because of the general importance and interest of the questions presented by this case. We affirm.

■ This case involves two threshold questions: (1) whether defendant made a knowing and intelligent waiver of the protections afforded him under the Fifth Amendment[1] before he made oral and written statements to St. Charles County Sheriff's deputies during his post-arrest interview in Florida on September 5, 1981 and on the plane trip back to St. Charles on September 8, 1981; and (2) whether the statements defendant made on September 5, 1981 and September 8, 1981 were obtained in violation of his right to counsel under the Sixth Amendment.[2]

The victims, Herbert and Georgiana Kemp, were the grandparents of Julie Ann Parton—defendant's sixteen year old girlfriend and the mother of his five month old son. Parton and the baby boy resided with the Kemps. Sometime after the baby was born, the Kemps, dissatisfied with their granddaughter's relationship with defendant, threatened to take the child away from her if she did not end her affair with defendant.

To silence the Kemps' criticism of his relationship with Parton, defendant murdered the Kemps on August 27, 1981, in the family room of their home. Earlier in the day, defendant and Parton had carefully planned the crime. On August 27, 1981, having just parked their car after returning from work, Mr. and Mrs. Kemp began to enter their home through the family room which was connected to the garage. Defendant, waiting inside the family room and armed with Mr. Kemp's rifle, shot Mrs. Kemp first and then fired three bullets into Mr. Kemp. He then shot Mrs. Kemp a second time, in the head. While these gruesome events were occurring, Parton was upstairs in the kitchen with the baby boy.[3]

After killing Mr. and Mrs. Kemp, defendant and Parton removed the victim's bodies from the house and placed them in the trunk of Mr. Kemp's car. They then drove to a local bank where they cashed checks on the Kemps' account. That evening they drove to a wooded area near Festus, Missouri, where they dumped the victims' bodies. The bodies of the slain couple were discovered the following day. Defendant and Parton fled the state that night.

Defendant, on August 30, 1981, telephoned his mother and instructed her to

---

**1.** It should be observed that the major thrust of defendant's Fifth Amendment argument is that his constitutional right against self-incrimination was violated; however, he is also arguing that the statements were obtained in violation of his right to counsel under the Fifth Amendment.

This right to counsel, which is separate and distinct from the right to counsel guaranteed by the Sixth Amendment, was delineated in *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), as one of the procedural mechanisms designed to safeguard an individual's constitutionally based right against self-incrimination. The significance of this distinction is that failure to warn an individual of his right to counsel under *Miranda* does not impact upon the individual's right to counsel under the Sixth Amendment—which may or may not have

attached depending on the facts involved in each case. *See Rhode Island v. Innis*, 446 U.S. 291, 300 n. 4, 100 S.Ct. 1682, 1689 n. 4, 64 L.Ed.2d 297 (1980); *see also* W.E. Ringel, Searches & Seizures, Arrests and Confessions, Vol. 2, § 24.4 (2nd ed. 1984); A. Amsterdam, Trial Manual for the Defense of Criminal Cases, Vol. 1, § 233 (4th ed. 1984).

**2.** Defendant's remaining points concerning jury selection and failure to give an instruction have been reviewed and are without merit.

**3.** In accord with a plea agreement reached with the Prosecuting Attorney of St. Charles County, Parton served as a witness for the State at defendant's trial.

find him a lawyer. The next day defendant's mother called Christine Miller Hendrix—an Assistant Public Defender in St. Charles County—and requested that Ms. Hendrix represent defendant in the present case. Defendant's mother apparently called Ms. Hendrix because earlier she had been appointed to represent defendant on four pending but unrelated felony charges.

On September 1, 1981, Ms. Hendrix called St. Charles County Sheriff,[4] Edward Uebinger, and requested that he notify her when defendant was apprehended. After speaking with Ms. Hendrix, Sheriff Uebinger was advised by Assistant Prosecuting Attorney Kohl that he had no legal duty to notify Ms. Hendrix because she had not yet been appointed defendant's counsel in the case.[5]

That same day, Prosecutor Kohl, in an ex parte proceeding, swore out an affidavit to obtain a warrant for defendant's arrest. During this period of time, the sheriff learned that defendant was planning to meet a relative of his at the Miami, Florida airport. Responding to this lead, the sheriff sent two deputies carrying a warrant for defendant's arrest to Miami on September 4, 1981. Defendant was arrested at the Miami airport on September 5, 1981. The oral and written statements that defendant sought to suppress, but which were admitted into evidence, were made after his arrest on September 5, 1981, and on the plane flight back to St. Charles on September 8, 1981.

■ Initially, it should be noted that in reviewing the trial court's disposition of

---

**4.** Ms. Hendrix and Sheriff Uebinger's conversation on September 1, 1981, was recorded as a routine in-coming call. Their conversation consisted of the following exchange:

UNIDENTIFIED SPEAKER: Sheriff's Office.

MS. HENDRIX: Yes. This is Christine Miller-Hendrix of the Public Defender's. Is Sheriff Uebinger in?

UNIDENTIFIED SPEAKER: He's not in his office. Let me see if I can try to find him.

MS. HENDRIX: Tell him it's about Joe Beck.

UNIDENTIFIED SPEAKER: Okay. And what was your name again?

MS. HENDRIX: Hendrix, I'm the Assistant Defender.

SHERIFF UEBINGER: Sheriff Uebinger.

MS. HENDRIX: Yes, Sheriff, this is Christine Miller-Hendrix, the Public Defender.

SHERIFF UEBINGER: Uh-huh.

MS. HENDRIX: Joe Beck, I'm representing him now on several other charges. I, being the ardent newspaper and television water [sic] I am, didn't even know this was coming down till Monday and didn't know Joe was involved until sometime yesterday.

SHERIFF UEBINGER: Uh-huh.

MS. HENDRIX: And I just talked to his mother.

SHERIFF UEBINGER: Uh-huh.

MS. HENDRIX: And she said that she had talked to you on a couple of occasions. So first of all I wanted to let you know that I am representing him currently.

SHERIFF UEBINGER: Okay.

MS. HENDRIX: And leave you my home number which I usually don't give it out to anybody so I didn't want to give it to her necessarily.

SHERIFF UEBINGER: Okay.

MS. HENDRIX: But it's [telephone number] and if you can't reach me, you can reach Tim and that's [telephone number].

SHERIFF UEBINGER: [repeating portion of telephone number].

MS. HENDRIX: Yeah.

SHERIFF UEBINGER: Okay.

MS. HENDRIX: And one or the other of us should always be able to be contacted at any time if you turn Joe up. I mean, *I'm sure we'll be representing him.* (our emphasis)

SHERIFF UEBINGER: Okay.

MS. HENDRIX: I've got him on about four felonies now. In fact, he's supposed to be sentenced a week from today—

SHERIFF UEBINGER: Okay.

MS. HENDRIX: —in Circuit Court on one of them. So if you hear anything from him or pick him up or anything, please let me know and preferably before any questioning, in fact, I insist.

SHERIFF UEBINGER: Okay.

MS. HENDRIX: Thank you.

SHERIFF UEBINGER: Okay.

MS. HENDRIX: Bye-bye.

SHERIFF UEBINGER: Bye.

**5.** The state did not raise the question of whether the mere fortuity that defendant was represented by Ms. Hendrix on four pending, but wholly unrelated, felony charges should suffice to automatically convert Ms. Hendrix into his general counsel for each and every one of his legal maladies. Consequently, we reserve judgment on this question for another day.

However, *see United States v. Masullo,* 489 F.2d 217, 223 (2d Cir.1973); *State v. Ture,* 353 N.W.2d 502, 509–10 (Minn.1984); *State v. Clawson,* 270 S.E.2d 659, 668 (W.Va.1980).

defendant's motion to suppress,[6] this Court necessarily must defer to the trial court's superior opportunity to determine the credibility of the witnesses and the weight of the evidence. *State v. Boggs*, 634 S.W.2d 447 (Mo. banc 1982). Needless to say, this rule is a basic tenet of appellate review—and one deserving of strict compliance.

In *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." 384 U.S. at 478, 86 S.Ct. at 1630. To protect this constitutionally grounded right, the Court delineated a number of procedural safeguards that must be made known to an individual taken into custody. However, in the same breath, the Court, speaking through Chief Justice Warren, stated that "after such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement." 384 U.S. at 479, 86 S.Ct. at 1630.

Here, the record reveals that before defendant was informed of his Miranda rights on September 5, 1981, the deputy then present asked him if he could read and write. After indicating to the officer that he could read and write, defendant was handed an identical copy of the "rights card" that was about to be used to appraise him of his *Miranda* rights. With card in hand, defendant was then advised of his *Miranda* rights by the officer. Furthermore, after completing each line of the card, the deputy paused and asked defendant if he fully understood the meaning of what had just been read to him. To each successive inquiry, defendant made an affirmative response. And to further document his comprehension, defendant initialed each line on the card.

After the officer had finished reading defendant his *Miranda* rights, he asked defendant if he was interested in giving a statement. Defendant answered yes and then proceeded to give oral and written statements of exculpatory nature; and at no point throughout this period of time did defendant request the presence of Ms. Hendrix—or any other attorney. On September 8, 1981, defendant was again given his *Miranda* rights and again chose to make incriminating statements before seeking the advice of an attorney.

 In arguing that this waiver was not knowing and intelligent, the defendant has focused exclusively upon the fact that he was not informed of Ms. Hendrix' requests. The sheriff's failure to inform defendant of this information was magnified into official misconduct[7] that never took place but which according to the defendant

---

6. In refusing to suppress the statements made on September 5 and 8, the experienced trial court found that "defendant at NO time prior to being interrogated, or during interrogation requested or indicated in any way that he desired to consult with counsel or have counsel present during his interrogation." Furthermore, the court found that "defendant, prior to making any statements, was fully advised of his constitutional (Miranda) rights; and he fully understood ... that he had a right to consult with counsel and to have his lawyers present when being questioned by police." Legal File at 162.

7. We do not quarrel with the principle that deceptive practices, collusion and other types of misconduct on the part of the police and other officials can and should serve as a basis for invalidating waivers obtained through the use of such practices. However, we find the use of the term "deceit" far too harsh and simply inaccurate to describe Sheriff Uebinger's decision not to disclose to Ms. Hendrix that Prosecutor Kohl had advised him he had no legal duty to first notify Ms. Hendrix before attempting to seek a valid waiver and statement from defendant. The record does not substantiate the allegation that the sheriff and the prosecutor engaged in deceit and official misconduct.

Furthermore, it should be noted that Ms. Hendrix' request that she be notified before any questioning took place was legally insufficient to invoke defendant's Fifth Amendment rights. Appellant's constitutional privilege against self-incrimination is a personal one and is a right that cannot be exercised by third parties. *United States v. Nobels*, 422 U.S. 225, 233, 95 S.Ct. 2160, 2167, 45 L.Ed.2d 141 (1975).

was responsible for vitiating his ability to make a knowing and intelligent waiver.

■ Determining whether a waiver constitutes a "knowing and intelligent relinquishment or abandonment of a known right or privilege, [is] a matter which depends in each case 'upon the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused.'" *Edwards v. Arizona,* 451 U.S. 477, 482, 101 S.Ct. 1880, 1883, 68 L.Ed.2d 378 (1981), quoting with approval *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938); *See also, North Carolina v. Butler,* 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979).

Defendant's contention that his waiver was not knowing and intelligent is premised on the notion that the information that was not disclosed to him would have had a material bearing on his reasoning process had it been made known to him. However, his own testimony refutes the validity of this argument. According to his testimony and that of his mother's, he called his mother a few days before his arrest *and instructed her to find him a lawyer.* It is simply incredulous to think that at the time of his arrest, defendant had forgotten that just a few days earlier he had specifically requested his mother to find him a lawyer.

Other factors to be considered under this analysis are the background, experience and conduct of the accused. In *Fuentes v. Moran,* 572 F.Supp. 1461 (D.R.I.1983), aff'd., 733 F.2d 176 (1st Cir.1984) the court—faced with this very same issue— noted:

> The record is replete with references to myraid criminal matters with which Fuentes had been involved. He was obviously ... no stranger to the criminal justice system. While such facts do not, in and of themselves, lighten the government's burden ... they do show rather clearly that Fuentes had considerable background upon which to draw when apprehended. The defendant's 'back-

ground' is, of course, a factor in the equation. (citations omitted).

572 F.Supp. at 1472, n. 4.

Here, the defendant was not a neophyte when it came to dealing with the police and the use of attorneys. At the time defendant brutally murdered the Kemps, he was awaiting sentencing on four unrelated felonies and on probation for a number of misdemeanors.

■ In light of the careful attention the deputies gave to insuring that defendant was properly informed of his *Miranda* rights, his unequivocal responses and determined conduct, evince nothing less than a deliberate, firm, knowing, and intelligent choice to speak without the prior counsel of Ms. Hendrix or any other attorney.[8] After reviewing all of the evidence presented, the trial court concluded that defendant had effected a knowing and intelligent waiver of his Fifth Amendment rights. This conclusion is amply supported by substantial evidence.

In addition to arguing that his Fifth Amendment rights were violated, defendant also contends that the statements he made on September 5, 1981 and September 8, 1981, were obtained in violation of his right to counsel under the Sixth Amendment.

In defining the contours of an individual's right to counsel under the Sixth Amendment, the Supreme Court in *Kirby v. Illinois,* 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972) held that "it has been firmly established that a person's Sixth and Fourteenth Amendment right to counsel attaches only at or after the time that adversary judicial proceedings have been initiated against him." 406 U.S. at 688, 92 S.Ct. at 1881. Under the teachings of *Kirby,* which is the rule in most jurisdictions, *Cf. People v. Cunningham,* 49 N.Y.2d 203, 424 N.Y.S.2d 421, 400 N.E.2d 360 (1980), the question of whether the right to counsel has attached is preliminary to the ques-

---

**8.** Compare *Burbine v. Moran,* 589 F.Supp. 1245, 1250 (D.R.I.1984), *rev'd,* 753 F.2d 178 (1st Cir. 1985); *State v. Burbine,* 451 A.2d 22 (R.I.1982).

**160**

tion of whether the right has been violated. Should it be determined that the defendant's right never attached, it will be unnecessary to inquire whether there was a violation.

■ Attachment of the right to counsel occurs at the initiation of adversary judicial proceedings against an accused "by way of *formal charge, preliminary hearing, indictment, information or arraignment.*" (our emphasis), 406 U.S. at 689, 92 S.Ct. at 1882. *See also, Brewer v. Williams,* 430 U.S. 387, 401, 97 S.Ct. 1232, 1240, 51 L.Ed.2d 424 (1977). When defendant was arrested and gave statements to the deputies on September 5, 1981 and September 8, 1981, *none* of these procedural events had transpired. It was not until September 29, 1981 that an information was filed formally charging defendant with two counts of capital murder.

■ At the time these statements were made, the only document that had been filed was an affidavit sworn out by the prosecuting attorney—for the sole purpose of securing an arrest warrant with which to apprehend defendant who was over one-thousand miles away in Florida. Defendant would have us color this ex parte event as the initiation of adversary judicial proceedings sufficient to trigger his Sixth Amendment right to counsel. In *Morris v. State,* 532 S.W.2d 455 (Mo. banc 1976), this Court, citing *Kirby* with approval, determined that the issuance of an arrest warrant did not amount to the initiation of adversary judicial proceedings—as defined within the framework of *Kirby. See also, State v. Boggs,* 634 S.W.2d 447 (1982) (Sixth Amendment right to counsel attached after indictment or information or commencement of adversary criminal proceedings).

When defendant was arrested and placed in custody, his only right to counsel was that afforded him under *Miranda.* However, he knowingly and intelligently elected to waive this right. Defendant was the subject of an arrest warrant—and not the subject of a formal charge in the nature of an indictment or information. Holding that the swearing out of an ex parte affidavit and the issuance of an arrest warrant is akin to the initiation of adversary judicial proceedings would result in swinging the pendulum of criminal justice far too distant from society's interest in effective and meaningful criminal investigations.

The judgment is affirmed.

RENDLEN, C.J., and HIGGINS, GUNN and BLACKMAR, JJ., concur.

WELLIVER and DONNELLY, JJ., dissent in separate opinions.

WELLIVER, Judge, dissenting.

I respectfully dissent. The dispositive issue in this case is whether, in light of the totality of circumstances, appellant knowingly and intelligently waived his Fifth Amendment right to counsel before making certain incriminating statements that were admitted into evidence at trial. Chief among the pertinent circumstances affecting the purported waiver is the conscious failure of the sheriff and the prosecutor and their subordinates to inform appellant that his retained counsel had requested to consult with him prior to police interrogation. The principal opinion obfuscates the seriousness of this omission, I submit, by ignoring both relevant evidence in the record and the weight of legal precedent on this issue. I am convinced that the statements in question are the fruit of a conspiracy of deception and evasion orchestrated by the prosecutor and the sheriff in order to create a situation likely to induce appellant into making incriminating statements without the assistance of counsel. For this reason, I believe the circuit court erred in admitting the statements.

The principal opinion casually dismisses the factual premises underlying appellant's Fifth Amendment claims by portraying Hendrix, the assistant public defender, as a meddling interloper and denying any misconduct on the part of the sheriff or the prosecutor. The record belies the Court's characterization of these crucial issues. Under the law as it existed at the time of

appellant's arrest, Hendrix must be viewed as appellant's attorney at all relevant times in this proceeding. A statute then in effect provided.

A person, or someone on the person's behalf, who is charged or detained in connection with a felony or a misdemeanor for which the punishment of a jail sentence is provided by law, in a circuit having a public defender, may request that the public defender represent him, and if the public defender is satisfied that such a person is indigent, the defender shall furnish appropriate representation.

§ 600.061, RSMo 1978 (repealed 1982 Mo. Laws 697). It is beyond dispute that Hendrix, having been approached by appellant's mother at his direction, was entitled to represent appellant in view of the fact that he had been declared indigent in connection with other criminal charges then pending. So incontrovertible is this fact that the State has never challenged the matter. It is troubling indeed that the principal opinion omits any mention of this most relevant statute since it figured so prominently in the briefs.

The principal opinion also ignores record evidence relied on by appellant to establish police and prosecutorial misconduct. The opinion mentions only the telephone conversation between Hendrix and Sheriff Uebinger on September 1, 1981 in which the sheriff assured Hendrix he would notify her when appellant was arrested. Following that conversation, on September 3, 1981, Hendrix encountered Assistant Prosecuting Attorney Kohl in a judge's chambers and repeated her request that she be informed when appellant was arrested and before any questioning. Kohl did not disclose that he had advised the sheriff not to honor her request. On September 8, after learning of appellant's arrest from newspaper reports, Hendrix again telephoned Sheriff Uebinger. The tape of the conversation demonstrates that the sheriff agreed to notify her when appellant arrived at the jail:

**Ms. Hendrix:** Okay, and you will notify me so I can go down and speak with him when you get him there?

**Sheriff Uebinger:** Right.

Later that day, however, Hendrix learned from another source that appellant had been brought to the St. Charles County jail. She immediately went to the jail, arriving at approximately 9:30 p.m., and requested but was denied permission to see appellant. Hendrix telephoned Kohl, and in the recorded conversation Kohl indicated that she was being denied access to appellant at his orders because he believed she had no right to see him. Hendrix then located an associate circuit judge who called the jail and directed that Hendrix be permitted to see appellant. Hendrix finally saw appellant at approximately 11 p.m. on September 8. However, during the span of time Hendrix waited to see appellant, deputies had again questioned appellant and he had prepared and signed a third statement, this one identical in substance to the one obtained on the plane. The circuit court later sustained appellant's motion to suppress this statement.

After reviewing the evidence in this case, the Eastern District held that appellant could not have intelligently waived his right to counsel because he was never informed of his attorney's efforts to consult with him. I agree. Courts in a number of jurisdictions have held that a criminal suspect cannot be held to have knowingly and intelligently waived his right to counsel when he was not informed that his attorney had requested, but had been denied an opportunity to consult with him prior to police interrogation. *See Weber v. State,* 457 A.2d 674 (Del.1983); *People v. Smith,* 93 Ill.2d 179, 66 Ill.Dec. 412, 442 N.E.2d 1325 (1982), *cert. denied,* 461 U.S. 937, 103 S.Ct. 2107, 77 L.Ed.2d 312 (1983); *State v. Matthews,* 408 So.2d 1274 (La.1982); *Commonwealth v. McKenna,* 355 Mass. 313, 244 N.E.2d 560 (1969); *State v. Haynes,* 288 Or. 59, 602 P.2d 272 (1979), *cert. denied,* 446 U.S. 945, 100 S.Ct. 2175, 64 L.Ed.2d 802 (1980); *State v. Jones,* 19 Wash.App. 850, 578 P.2d 71 (1978). These decisions do not go so far as to say that *Miranda* rights can only be waived in the

presence of counsel, a proposition this Court has rejected previously. *State v. Richter,* 647 S.W.2d 513, 518–19 (Mo. banc 1983); *State v. Buckles,* 636 S.W.2d 914, 923–24 (Mo. banc 1982); *State v. McConnell,* 529 S.W.2d 185 (Mo.App.1975). Nor do they stand for the proposition that an attorney can invoke his client's Fifth Amendment rights, as such rights are personal to the holder. *See United States v. Nobles,* 422 U.S. 225, 233, 95 S.Ct. 2160, 2167, 45 L.Ed.2d 141 (1975). Rather, they reflect the sound judgment that in certain cases information regarding an attorney's request to see his client is likely to have such a material bearing on the client's decision to waive his counsel rights as to require its affirmative disclosure:

> To pass up an abstract offer to call some unknown lawyer is very different from refusing to talk with an identified attorney actually available to provide at least initial assistance and advice, whatever might be arranged in the long run. A suspect indifferent to the first offer may well react quite differently to the second. If the attorney appears on request of one's family, the fact may inspire additional confidence.

*State v. Haynes, supra,* 602 P.2d at 278 (footnote omitted).

Considering the totality of circumstances surrounding appellant's purported waiver, I am convinced that he could not act knowingly and intelligently without being advised of his counsel's requests. The record in this case leaves no doubt that the prosecutor and the sheriff conspired to induce appellant into making incriminating statements without the assistance of counsel. Through their omissions and deceptions, Kohl and Sheriff Uebinger led appellant to believe that he did not have counsel. The circuit court's finding that the deputies who took the statements from appellant did not know that he had counsel is irrelevant. To permit evasion of constitutional rights merely by assigning uninformed deputies to carry out that which otherwise could not be done, is to promote unconscionable practices. *See Weber v. State, supra,* at 686.

Notwithstanding its disclaimer, the principal opinion today puts this Court's imprimatur on a wholly unsavory example of official misconduct. "[S]ociety's interest in effective and meaningful criminal investigations," *supra,* at ——, does not require that we sanction police and prosecutorial practices that deny criminal suspects fundamental fairness. Retrial is a small price to pay for maintaining the integrity of our criminal justice system.

I would reverse and remand for retrial.

DONNELLY, Judge, dissenting.

In this case, there is an explicit waiver of the rights to remain silent and to have an attorney. The accused "initialed each line on the [Miranda] card."

The majority rejects the position that, in such circumstance, a confession should be suppressed only if such waiver was "obtained by coercion or because of incapacity or diminished intelligence." *State v. Clark,* 592 S.W.2d 709, 721 (Mo. banc 1980) (Donnelly, J., dissenting).

In my view, this rejection is unfortunate. It devalues further the concern for victims as a component in the social equation.

I respectfully dissent.