**STATE of Missouri, Plaintiff–Respondent,**

v.

**Matthew J. HENSLEY, Defendant–Appellant.**

**No. 24377.**

Missouri Court of Appeals,
Southern District,
Division Two.

July 30, 2002.

Motion for Transfer Denied
Aug. 15, 2002.

Application for Transfer Denied
Sept. 24, 2002.

Thomas D. Carver, Dee Wampler, Springfield, for appellant.

Jeremiah W. (Jay) Nixon, Attorney General, Karen L. Kramer, Assistant Attorney General, Jefferson City, for respondent.

PHILLIP R. GARRISON, Presiding Judge.

Matthew J. Hensley ("Defendant") was charged with two counts of first-degree murder, in violation of Section 565.020, and two counts of armed criminal action, in violation of Section 571.015.[1] Following a jury trial, he was found guilty of two counts of second-degree murder and two counts of armed criminal action, and was sentenced to a total of twenty-five years imprisonment. Defendant appeals.

Defendant does not challenge the sufficiency of the evidence supporting his convictions. The evidence, therefore, viewed in the light most favorable to the verdicts, shows the following:

In June 1999, Defendant purchased a Hungarian-made, nine-millimeter copy of a Browning High Power semiautomatic handgun, ammunition, a holster, and a spare magazine for the gun. Defendant showed the gun to his girlfriend, and told her that he wanted the gun to "protect his stuff" and to make him feel safe.

On the evening of July 2, 1999, Ray Smith ("Smith"), a neighbor, saw Defendant standing on Defendant's front porch waving at him. Smith went into Defendant's home, and was there a few minutes

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

when Roy Cotter ("Cotter") and Jarrett Turner ("Turner") arrived in Turner's pickup truck. Cotter asked Smith if he would like a beer and went outside and returned with a beer and a marijuana cigarette. As Cotter and Smith smoked the marijuana cigarette, Defendant went into the bedroom.

Smith heard something that sounded like firecrackers, but discovered that it was Defendant firing a gun at Cotter and Turner. Smith got up, tried to grab the gun, and asked Defendant, "[W]hat are you doing?" and "[W]here did this [gun] come from?" Defendant returned to his bedroom, and Smith saw him picking up another clip for the gun. After being instructed to do so by Smith, Defendant put the gun down.

Smith and Defendant went into the kitchen, and Defendant said, "You got to help me with this, you got to help me take care of this." Smith said, "I can't help you with this, I can't help you." "I got a family, I can't help you." Defendant said, "You have got to help me do something." Smith said, "I don't know what I can do," and Defendant said, "Call my dad." Smith agreed to call Defendant's father, Kenney Hensley, and Defendant gave Smith his father's phone number, which Smith wrote down on his hand.

Although there was a phone at Defendant's house, Smith went back to his house to call Kenney Hensley and then 911. Smith could not find the cordless phone, however, and went to a neighbor's house to use the phone. Smith told his neighbor, Nancy Chmielewski ("Chmielewski"), that two people had been shot at Defendant's house and that he needed to use the phone. Smith, who was very agitated and upset, told Chmielewski that Defendant had asked him to call Kenney Hensley. Smith called Kenney Hensley and told him that Defendant had shot two people and

that he needed to go get Defendant at the creek. Smith then called 911.

Smith started to return to Defendant's house to meet the police, but changed his mind and returned to the Chmielewski's house. Kenney Hensley then called Chmielewski and asked if what Smith had said was true. Chmielewski said she did not know, but something terrible had to have happened and he had better check on it. Two police officers then came to Chmielewski's house inquiring where the shooting had occurred, and Smith directed them to Defendant's home.

When Deputy Don Reid ("Deputy Reid") of the Howell County Sheriff's Department arrived at the scene of the shooting, he went in the house and saw two men slumped over on a couch. Cotter still had his sunglasses in his hand, and Turner had a soda bottle between his legs and a lighter in his hand. Ambulance personnel verified that the two men were dead.

In the meantime, Kenney Hensley had picked Defendant up at the creek and had driven him back to Defendant's house. Officers took custody of Defendant, read him his *Miranda* rights, and transported him to the Howell County Sheriff's Department.

A search of Defendant's house revealed a nine-millimeter, semi-automatic pistol lying on the bed in Defendant's bedroom. Defendant's fingerprint was found on the gun. No magazine was in the gun, but there was an unloaded magazine on the bed a short distance from the gun. A loaded magazine for the gun was found in the dresser drawer under some clothing. An empty ring box on top of the dresser contained some small plastic baggies with a white powdery residue in them. A plastic bag with marijuana and paraphernalia was also on top of the dresser. Spent shell casings were found throughout the

kitchen and living room, and bullet holes were in the wall opposite the bedroom.

Sergeant Kirby Johnson ("Sergeant Johnson") of the Missouri State Highway Patrol talked with Defendant at the Howell County Sheriff's Department. Defendant had been read his *Miranda* rights at the scene of the shooting. At the Sheriff's Department, Sergeant Johnson asked Defendant if he understood those rights, and he said he did. Defendant asked Sergeant Johnson what was going on, and Sergeant Johnson told him that two people had been found dead in his house. Defendant said he knew nothing about that and that he had been at the swimming hole since around 6 p.m. that evening. Defendant said no one should have been at his house, and that he would assist in any way in the investigation. Sergeant Johnson asked if anyone had been with him at the swimming hole, and Defendant said just his dog. Sergeant Johnson explained that officers were at the house processing the crime scene and might need to secure evidence or search. Sergeant Johnson obtained written consent from Defendant to search his car, his residence, and an outbuilding. Sergeant Johnson told Defendant that it was strictly voluntary and he did not have to give permission to search.

Chief Deputy Mickey Hughes ("Chief Deputy Hughes") of the Howell County Sheriff's Department contacted Sergeant Johnson about 3 a.m., and they interviewed Defendant again at 3:13 a.m. Sergeant Johnson again advised Defendant of his *Miranda* rights, and Defendant indicated that he understood them. Defendant did not indicate that he wanted a lawyer or that he did not want to talk to Sergeant Johnson. Initially, Defendant said that he had worked at his father's garage until four or five in the afternoon. He said that at about 6 p.m., he and his dog went to the swimming hole where he

drank some dandelion wine. Defendant said that he knew Smith, but that he did not socialize with him. He also indicated that he knew Cotter, but did not know Turner.

Sergeant Johnson told Defendant that Smith said Defendant shot Cotter and Turner. Defendant responded, "No, [Smith] didn't tell you that." Sergeant Johnson showed Defendant crime scene photos of Cotter and Turner. Defendant identified Cotter, but claimed he did not know Turner. Sergeant Johnson asked Defendant if he owned any firearms or had shot a weapon that day. Defendant said he owned several guns, including two twelve-gauge shotguns, an SKS deer rifle, and a nine-millimeter handgun. Defendant claimed that he had not shot a gun that day.

Sergeant Johnson also told Defendant that Smith had called 911 and Kenney Hensley. Sergeant Johnson stated that Smith had the last four numbers of Kenney Hensley's phone number written on his left hand, and that Smith had said that Defendant told him to call his father. Defendant responded, "No, [Smith] didn't tell you that, he ain't around." Sergeant Johnson opened the door and showed Defendant that Smith was there.

After Defendant saw Smith, his attitude and story changed. Defendant said that Cotter and Turner came over to his house and wanted drugs, and threatened to kill him if he did not comply with this request. Defendant said that was why he shot them, acknowledging that he never saw Cotter or Turner with a weapon that night. Following the shooting, Defendant said that he told Smith to call Kenney Hensley and tell him where he was. Defendant stated that he laid the gun on the bed and went to the creek, and that Kenney Hensley found him and drove him to Defendant's house.

At trial, Defendant testified that Smith had shot Cotter and Turner with Defendant's gun. At the close of the evidence and arguments, the jury found Defendant guilty of two counts of second-degree murder and two counts of armed criminal action, and he was sentenced to twenty-five years imprisonment. Defendant appeals.

■ In his first point on appeal, Defendant contends that the trial court erred when it failed to disqualify the Howell County Prosecuting Attorney's Office. He argues that a conflict of interest or the appearance of one existed in that shortly before the commencement of the trial co-counsel for Defendant accepted employment with the Howell County Prosecuting Attorney's Office.

On the day of trial, defense counsel announced that Shane Voyles would be her second chair. She stated that David Dykas ("Dykas"), who had been second chair and who was going to do some direct and cross-examination of some of the witnesses, had accepted a position with the Howell County Prosecuting Attorney's Office a week ago, but would not be starting that job until later in the month. Dykas had said that he would have "felt uncomfortable" as second chair in light of the fact that he had been hired by the prosecutor's office. There had been no communication by the prosecutor's office with Dykas concerning his representation of Defendant.

Defense counsel stated at trial that as soon as she received official notice of Dykas's plans, she discussed it with Defendant and that he was "fully aware and is fine with it." The trial court asked Defendant if he understood what defense counsel had said, and he replied, "Yes." The trial court also asked Defendant if he had any complaints or anything he wanted to say about the matter, and Defendant said that he was "concerned," but that he "really [didn't] have much to say about it." Nothing more was said about the matter through the course of the trial.

Defendant was convicted on May 11, 2001. On May 29, 2001, Dykas began working for the Howell County Prosecuting Attorney's Office as a child support enforcement attorney.

On June 4, 2001, Defendant filed a motion for a new trial, in which he alleged that the trial court had erred by "not inquiring further into the hiring of [D]efendant's second chair trial counsel," and in failing to disqualify Howell County Prosecutor Michael Hutchings ("Hutchings") and his entire office from participating in the trial. Defendant pled that he had not expressly waived the conflict. He claimed that he was prejudiced because he was "forced to choose to proceed with lead counsel alone handling all witnesses at trial, with a newly licensed assistant serving as second chair, or seeking yet another continuance to allow another second chair to prepare for portions of the trial."

On July 13, 2001, a sentencing hearing and the hearing on the motion for a new trial were held. Immediately prior to the hearings, Hutchings withdrew leaving Assistant Attorney General Michael Hendrickson ("Hendrickson") to proceed with the sentencing and the hearing on the motion for a new trial. Hendrickson had been involved in the prosecution of the case since shortly after the indictment had been filed and had been the lead prosecutor for the State, handling the pre-trial motions, voir dire, opening statement, most of the witnesses, the instructions conference, and closing argument. Hendrickson and Hutchings had decided when the jury returned its verdict in May that Hendrickson would handle the motion for a new trial and the sentencing hearing alone.

At the hearing on the motion for a new trial, Hutchings testified that since May 29, 2001, he had spoken with some of the witnesses who had wanted to know whether they would be able to make statements at the sentencing hearing. Hutchings had told them that they would probably be allowed to make statements, but did not discuss the contents of their statements with them.

 Preliminarily, we note that Defendant failed to preserve this point for appellate review. When Defendant first informed the trial court of the alleged conflict, he made no request for any relief whatsoever. The rules of appellate review require an objection and proper request for relief as a predicate to examination on appeal of matters arising at trial. *State v. Hamilton*, 996 S.W.2d 758, 761 (Mo.App. S.D.1999). We are, however, permitted, in our discretion, to review for plain error affecting substantial rights, which results in manifest injustice or miscarriage of justice. *See State v. Roberts*, 948 S.W.2d 577, 592 (Mo. banc 1997). We will do so here.

 Relief under the plain error standard is granted only when an alleged error so substantially affects a defendant's rights that a manifest injustice or miscarriage of justice inexorably results if left uncorrected. *State v. Varvera*, 897 S.W.2d 198, 201 (Mo.App. S.D.1995). The determination of whether plain error exists must be based on a consideration of the facts and circumstances of each case. *Id.* See also *Hamilton*, 996 S.W.2d at 762.

In the instant case, Defendant states that "the moment [Dykas] accepted employment he became an agent of the prosecutor's office and was fully subject to ... Rules 4–1.7 and 4–1.11 of the Missouri Rules of Professional Conduct for attorneys." Defendant, however, cites no authority for the proposition that because a person had accepted a job offer, he was an agent of the prospective employer despite the fact that he has not actually begun work for the employer.

At the time of Defendant's trial, Dykas had withdrawn from his representation of Defendant and was not working for the prosecutor's office. The plain language of the Rules of Professional Conduct regarding conflicts of interest require that the attorney at the heart of the alleged conflict be representing a client or participating in a matter, or in order to disqualify the attorney's firm, the attorney must be associated with that firm. *See* Missouri Rules of Professional Conduct 4–1.7 and 4–1.11 (2002). At the time of trial, Dykas was representing no one, was not participating in the matter, and was not working with any law firm, public office, or governmental entity.

The cases relied upon by Defendant in which conflict of interests were found are factually distinguishable from the instant case. In all three of the cases cited by Defendant, there was a conflict because the defendant's former attorney was actively associated with and working for the prosecutor's office at the time the defendant's case was being prosecuted. In *State v. Ross*, 829 S.W.2d 948 (Mo. banc 1992), two part-time prosecuting attorneys were contemporaneously working for the law firm that was defending Ross in a civil tort action arising out of the same circumstances as the criminal charges against him. In *State v. Reinschmidt*, 984 S.W.2d 189 (Mo.App. S.D.1998), a public defender, who had worked on Reinschmidt's case, subsequently took employment with the Greene County Prosecuting Attorney's Office and was working there at the same time that office was prosecuting Reinschmidt's case. In *State v. Croka*, 646 S.W.2d 389 (Mo.App. W.D.1983), Croka's defense counsel withdrew from the case, joined the

prosecutor's office, and was working there while that office was prosecuting Croka.

In the instant case, at the time of trial, there was no conflict of interest as Dykas was not yet employed by the prosecutor's office and there was no evidence that he had any contact with them regarding his prior representation of Defendant. Although Dykas did go to work for the prosecutor's office before Defendant was sentenced, the Howell County Prosecuting Attorney's Office withdrew from the case at the sentencing hearing in order to alleviate any possible conflict.

Furthermore, unlike the cases cited by Defendant, we have reviewed only for plain error. Relief under Rule 29.12(b), Missouri Rules of Criminal Procedure (2002), is available only when an alleged error so substantially affects a defendant's rights that a manifest injustice or miscarriage of justice inexorably results if left uncorrected. *Hamilton*, 996 S.W.2d at 763. Applying that standard to this case, we find that the trial court did not plainly err in failing to *sua sponte* disqualify the Howell County Prosecuting Attorney's Office. Defendant's point is denied.

■ In his second point, Defendant asserts that the trial court erred in overruling his motion to suppress his confession. He contends that he and "his proxies had invoked his right to counsel prior to his interrogation," and that he was denied access to his attorney during his interrogation.

■ Initially, we note that a trial court's ruling on a motion to suppress is interlocutory and is subject to change during trial. *See State v. Shifkowski*, 57 S.W.3d 309, 316 (Mo.App. S.D.2001). Accordingly, a motion to suppress, in and of itself, preserves nothing for appeal, and ordinarily, a point relied on that refers only to a ruling on such a motion is fatally

defective. *Id.; State v. Cardona–Rivera*, 975 S.W.2d 200, 203 (Mo.App. S.D:1998).

■ The scope of an issue to be decided on appeal is that which is framed in the point relied on. *Cardona–Rivera*, 975 S.W.2d at 203. Defendant's second point relied on challenges only the trial court's ruling on the motion to suppress. No mention is made in the point relied on of any objection made by trial counsel or any error made by the trial court in the reception of the disputed evidence. Ordinarily, this would be fatal to any consideration of this point. *See Shifkowski*, 57 S.W.3d at 316. Although the error was not properly raised on appeal, we exercise our discretion and review for plain error.

■ In reviewing a trial court's denial of a motion to suppress, the appellate court is limited to determining whether the ruling is supported by substantial evidence. *State v. Rowe*, 67 S.W.3d 649, 654 (Mo.App. W.D.2002). All facts and reasonable inferences therefrom are to be viewed in the light most favorable to the trial court's ruling. *Id.* The weight of the evidence and credibility of witnesses are issues for the trial court to resolve. *Shifkowski*, 57 S.W.3d at 316.

The evidence at the motion to suppress hearing, viewed in the light most favorable to the trial court's ruling, showed:

Trooper David Finley ("Trooper Finley") read Defendant his *Miranda* rights at the scene of the shooting. Trooper Finley informed him that he had the "right to talk to a lawyer and have him present with [him] while ... being questioned" and that, if he wanted, he could "decide at any time to exercise [his] rights and not answer any questions or make any statements." Defendant said that he understood those rights, and then he spoke with Trooper Finley at the scene. At no time

did he ask for a lawyer or indicate that he did not wish to talk to Trooper Finley.

Chief Deputy Hughes also spoke with Defendant at the scene. Defendant never indicated that he wanted to speak with a lawyer or that he did not want to speak with law enforcement. Defendant was not placed under any duress and no promises were made to Defendant in exchange for his speaking with law enforcement officials.

Sergeant Johnson first met with Defendant at the Howell County Sheriff's Department at about 11:18 p.m. on July 2, 1999. Defendant acknowledged that he had been given his *Miranda* rights and indicated that he would cooperate fully in the investigation. Sergeant Johnson obtained a brief statement concerning Defendant's activities that evening. Sergeant Johnson gave Defendant a consent form, and Defendant consented to a search of his residence, an outbuilding, and his vehicle. Defendant said that he would talk to Sergeant Johnson again later.

Between 11:18 p.m. and midnight, Sergeant Johnson had contact with Kenney Hensley. Kenney Hensley had been in the waiting room of the Howell County Sheriff's Department, and Sergeant Johnson wanted to get a statement from him concerning his knowledge of the shooting. Kenney Hensley refused to speak with Sergeant Johnson, and indicated that he had already given a written statement to the sheriff. Kenney Hensley asked if his son was there, and if he could see him. Sergeant Johnson denied his request and terminated the interview. Kenney Hensley said nothing to Sergeant Johnson about hiring a lawyer for Defendant. Sergeant Johnson indicated that Kenney Hensley told him that he had retained Jacob Garrett ("Attorney Garrett") as counsel for himself.

At about 12:10 a.m. on July 3, 1999, Attorney Garrett phoned the sheriff's office and spoke with Sergeant Johnson. Attorney Garrett wanted to know if Defendant was there, and Sergeant Johnson indicated that he was. Attorney Garrett said that he was "invoking his rights to his client," and that Sergeant Johnson was not to talk to Defendant. Sergeant Johnson told Attorney Garrett that Defendant was aware of his rights, and that when Defendant asked for Attorney Garrett or another attorney, those rights would be afforded to him. Attorney Garrett terminated the conversation.

Later that morning, Sergeant Johnson read Defendant his *Miranda* rights, and Defendant signed a waiver of those rights at 3:13 a.m. Defendant was told that he had the right to talk to a lawyer for advice before he was questioned and that he had the right to have a lawyer with him during questioning. He was also told that if he decided to answer questions without a lawyer present, he would still have the right to stop answering at any time. The waiver that Defendant signed stated that he was willing to make a statement, that he did not want a lawyer at that time, that he understood what he was doing, that no promises or threats had been made, and that no pressure or force of any kind had been used against him. Defendant said that he understood those rights, and he did not indicate that he wanted to speak with a lawyer. Defendant then spoke with Sergeant Johnson and Chief Deputy Hughes, and admitted that he had shot Cotter and Turner.

Defendant voluntarily gave a taped statement. Defendant was read his *Miranda* rights again, and he indicated that he understood what his rights were. During Defendant's taped statement, he never requested the presence of a lawyer or asked to contact one. Defendant never

indicated that he did not wish to speak to Sergeant Johnson or Chief Deputy Hughes.

The Fifth Amendment prohibition against compelled self-incrimination provides an accused with the right to have counsel present during custodial interrogations. *Miranda v. Arizona*, 384 U.S. 436, 479, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694, 726 (1966). If an accused requests an attorney, the interrogation process must cease until an attorney is provided or until the accused reinitiates the process of his or her own accord. *Edwards v. Arizona*, 451 U.S. 477, 484–85, 101 S.Ct. 1880, 1885, 68 L.Ed.2d 378, 386 (1981). This request must be actual, unambiguous, and unequivocal to trigger the right. *State v. Bucklew*, 973 S.W.2d 83, 91 (Mo. banc 1998). Without a clear assertion of the right to counsel, police officers may continue questioning. *Davis v. United States*, 512 U.S. 452, 459, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362, 371 (1994).

In the instant case, the trial court did not plainly err in denying Defendant's motion to suppress. "If one is informed of his right to remain silent under *Miranda*, and understands his right to remain silent under *Miranda*, and thereafter makes voluntary statements, it is absurd to say that such person has not made a knowing and intelligent waiver of his right to remain silent." *State v. Ringo*, 30 S.W.3d 811, 826 (Mo. banc 2000). Here, the evidence presented at the hearing on the motion to suppress showed that Defendant was informed of his *Miranda* rights numerous times, and that he voluntarily signed a waiver, which stated that he was willing to make a statement, that he did not want a lawyer at that time, that he understood what he was doing, that no promises or threats had been made, and that no pressure or force of any kind had been used against him.

Further, Attorney Garrett could not invoke Defendant's rights for him, and the fact that Defendant was not informed of Attorney Garrett's phone call had no bearing on the validity of the waiver of his rights. *See Moran v. Burbine*, 475 U.S. 412, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986); *Matney v. Armontrout*, 956 F.2d 824 (8th Cir.1992); *State v. Beck*, 687 S.W.2d 155 (Mo. banc 1985).

In *Moran*, the defendant's sister had called an attorney for him, and the attorney called the police station. The police told the attorney that they would not be questioning the defendant until the next day. Less than an hour later, the police began questioning the defendant. He was read his *Miranda* rights on three separate occasions, which he waived, and ultimately, he confessed. The defendant later argued that his confession should have been suppressed because he was not informed of his attorney's telephone call, which purportedly deprived him of information essential to his ability to knowingly waive his *Miranda* rights. The Supreme Court in *Moran* held that "[e]vents occurring outside of the presence of the suspect and entirely unknown to him surely can have no bearing on the capacity to comprehend and knowingly relinquish a constitutional right." 475 U.S. at 422, 106 S.Ct. at 1141, 89 L.Ed.2d at 421. The Supreme Court concluded that "[o]nce it is determined that a suspect's decision not to rely on his rights was uncoerced, that he at all times knew he could stand mute and request a lawyer, and that he was aware of the State's intention to use his statements to secure a conviction, the analysis is complete and the waiver is valid as a matter of law." 475 U.S. at 422–23, 106 S.Ct. at 1141, 89 L.Ed.2d at 422.

In *Matney*, the defendant's retained counsel learned of the defendant's arrest, called the police station, and was told that

the defendant was not there. The third time the attorney called, he was told that the defendant would not be available to speak with him for thirty minutes. While his attorney was attempting to contact him, the defendant signed a rights waiver form, stated that he did not want a lawyer present, and gave a detailed confession of the crimes he had committed. On appeal, the defendant argued that the police's failure to inform him of his attorney's attempts to contact him, as well as the misleading or deceptive statements made to his attorney, constituted a violation of the defendant's constitutional right to due process of law. Relying on Moran, the *Matney* court rejected the defendant's claim, finding that "[a] defendant who retains counsel, then waives his right to such counsel upon arrest, exhibits an even greater understanding of the nature of his legal rights and, consequently, an intelligent waiver of such rights." 956 F.2d at 826.

In *Beck,* the defendant, while fleeing from law enforcement officials, told his mother to get him an attorney. The attorney called the sheriff's office and asked to be informed when the defendant was apprehended. The defendant was arrested, the attorney was not notified of his arrest, and the defendant was informed of his *Miranda* rights, which he waived. The defendant then made a statement and did not request the presence of an attorney. The Supreme Court of Missouri, in rejecting the defendant's claim that his waiver was not knowing and intelligent because he had not been told of his attorney's inquiries, noted that the attorney's request was "legally insufficient" to invoke the defendant's Fifth Amendment rights. 687 S.W.2d at 158, n. 7. The *Beck* court stated that a defendant's constitutional privilege against self-incrimination is a personal one and cannot be exercised by third parties. *Id.*

Here, there was substantial evidence in the record demonstrating that Defendant's waiver of his *Miranda* rights was knowingly, intelligently, and voluntarily made. The trial court did not plainly err in denying Defendant's motion to suppress. Defendant's point is denied.

The judgment of the trial court is affirmed.

PARRISH and RAHMEYER, JJ., concur.