**STATE of Missouri,
Plaintiff-Respondent,**

v.

**Ellen M. REASONOVER,
Defendant-Appellant.**

No. 48453.

Missouri Court of Appeals,
Eastern District,
Division Two.

June 17, 1986.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 16, 1986.

Application to Transfer Denied
Sept. 16, 1986.

708

Mac Arthur Moten, St. Louis, George Hairston, Brooklyn, N.Y., for defendant-appellant.

William L. Webster, Atty. Gen., Gary L. Gardner, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

PER CURIAM:

Defendant Ellen Maria Reasonover was found guilty of capital murder, Section 565.001 RSMo 1978 (repealed effective October 1, 1984), and was sentenced to life imprisonment without probation or parole for fifty years. Defendant appeals. We affirm.

On January 2, 1983, at approximately 2:00 a.m., the body of James Buckley, a gas station attendant, was discovered in the storage room of a Vickers station on West Florissant Avenue, Dellwood, Missouri. He had been shot to death. The crime was publicized, and persons who had information about the crime were asked by the police to come forward. On January 3rd a woman who identified herself as Sheila Hill called the Dellwood police department, claiming she had been at the Vickers station and had seen three persons. Officer Pike, with whom she spoke, asked her to call again to speak with Captain Chapman. She called again on January 4th, and came down to the police station at 11:30 that evening. When asked for identification, Sheila Hill identified herself as Ellen Reasonover, the defendant herein.

Defendant said she had been doing laundry and went to the Vickers station to get change. She was not sure of the time, but thought she was at the station at about 1:30 a.m. the night of the murder. Defendant, who was considered a witness at this time, was taken to the Vickers station to reenact what she had seen. She stated that as she drove up, she saw a cream-colored station wagon leave the station. She also saw a black man in the cashier's cage, whom she assumed was an attendant. As she approached the cashier's cage, the black man took off his cap and left the cage to enter the main part of the station. Defendant knocked loudly on the window of the cage, but the black man did not return. She also saw a car parked on the right side of the building, which she described as a dark blue or black Oldsmobile or Buick with silver or gray trim and a spare tire container protruding from the top of the trunk. She described a second black man that she saw at the station, who was taller than the first and wore a green Army jacket. A third person was in the back of the car. As defendant was pulling out of the station she saw the man from the cashier's cage enter the car. She then proceeded to a nearby 7–Eleven store, where she again saw the two men as she

was coming out of the store. Defendant then returned to the laundromat.

In the early morning hours of January 5th, defendant picked out two photographs from 250 photographs shown to her by the police. The photographs were of Isaac Scott and Herman Staples. In subsequent lineups, she failed to pick out Isaac Scott but did identify Herman Staples as one of the two men she had seen. Upon investigation, the police discovered that the two men defendant picked out had both been incarcerated at the time of the crime. At about this time, it also came to the attention of the police that defendant had complained to the police about an ex-boyfriend who had broken out the windows of her car. The man was Stanley White, and he was seen by the defendant driving away in a car remarkably similar in description to the car she had described to the police as being at the Vickers station. The incident took place only a few days before the murder.

Upon being told by the police that the men she had picked out were in custody at the time of the murder, defendant stated she would try to get the name of the man with the cap from her sister or her sister's friend, as she believed she had seen this man at various parties. She gave the police the name of Willie Love, and identified him from a photographic array. On January 6, defendant identified Willie Love in a lineup. Also on January 6, the police began to question defendant about the incident concerning her car windows.

On January 7 defendant was asked to take a stress test, also referred to as a "modified polygraph" test. She consented to the test and was taken to the Bridgeton police station where the test was administered. After being transported back to the Dellwood police station, defendant was questioned about her activities from December 31, 1982 to January 3, 1983 in order to establish her whereabouts on the night of the murder. She repeated a sequence of events six times, and only once did she mention that she had been at the Vickers station on January 2. At this point the police were informed of the results of the stress test, which defendant failed. Defendant was then arrested and given her *Miranda* warnings.

Later, on the evening of that same day, defendant was transported from the Dellwood jail to the Jennings jail, where she was placed in a cell with Rose Jolliff and Marquita Butler. Defendant was released the following morning, January 8. Rose Jolliff later talked with the police who were investigating the murder. In essence, Jolliff stated that the defendant admitted committing the crime with Stanley White and Robert McIntosh. Defendant told Jolliff that she shot the victim seven times with a rifle because something had gone wrong and she feared the victim could identify her.

On February 9, 1983, the defendant was in custody on a separate unrelated charge, and was placed in a holdover cell of the St. Louis County jail with Carol Coates, Rose Winston, Elaine Carpenter, and Mary Ellen Lyner. Lyner subsequently made a deal with the prosecution in exchange for her testimony regarding admissions made by the defendant to her while both were confined in the holdover cell. The admissions in question are: "Those mother-fuckers picked me out of a lineup. I told them we should have blew their brains out too," and "Girl, we robbed a gas station and killed a man, you know, that Vickers station. I stay right down the street from there."

Subsequent to the admissions to Lyner, defendant had several conversations with various police officers, during which she threatened the officers and accused them of "putting a case on her," and stated that she would not "come in" or "roll over" on anyone. Stanley White was identified as being at the Vickers station on the night of the murder by a witness, Kenneth Main, who identified White on January 7, after his memory had been refreshed through hypnosis. On March 4, 1983, Robert McIntosh was identified as being at the Vickers station on the night of the murder by another witness, Anthony Longo. Further facts will be set out as they apply to specific points on appeal.

Defendant raises fourteen points on appeal, most as plain error. In brief, they are as follows: (1) there was insufficient evidence to convict defendant of capital murder; (2) the State failed to disclose exculpatory evidence in its possession; (3) the State failed to disclose the full extent of promises made to two informant witnesses in exchange for their testimony; (4) the State knowingly presented false and misleading testimony; (5) the alleged admission to Mary Ellen Lyner on February 9 should not have been permitted in evidence as it denied defendant her right to be tried fairly on the offense charged; (6) testimony derived from a police report should not have been permitted in evidence, on the basis of relevancy, improper foundation, and hearsay; (7) statements made by defendant regarding her activities from December 31, 1982 to January 3, 1983 should not have been permitted in evidence, as they were obtained in violation of defendant's *Miranda* rights; (8) the alleged admissions to Rose Jolliff were the fruit of an illegal arrest; (9) statements made by defendant to the police on February 25, 1983 should not have been permitted in evidence, as they were obtained in violation of defendant's Sixth Amendment right to counsel; (10) the prosecutor repeatedly testified regarding his involvement in the investigation of the crime charged, in violation of defendant's right to confront and cross-examine adverse witnesses against her; (11) the identifications of both of defendant's alleged co-actors were the result of a process that was impermissibly suggestive and conducive to irreparable mistaken identification; (12) defendant's trial counsel should not have been forced to begin voir dire at 7 P.M. on the first day of trial; (13) instruction No. 10 should not have been given, as it erroneously allowed MAI–CR 15.12 to modify MAI–CR 2.12, thus confusing the jury; (14) a circumstantial evidence instruction, MAI–CR 3.42, was erroneously denied.

In her first point on appeal, defendant claims the trial court erred in overruling her motion for judgment of acquittal at the close of all the evidence because there was insufficient evidence to convict defendant of capital murder. In reviewing a claim involving the sufficiency of the evidence, evidence supportive of the conviction is considered true, and favorable inferences from this evidence are to be indulged. *State v. Gordon*, 649 S.W.2d 903, 905–906 (Mo.App.1983).

Defendant in her brief asserts that the majority of the evidence in this case is circumstantial and capable of an innocent construction. Much of defendant's argument interweaves the allegations contained in her other points on appeal and depends upon assumptions based on these allegations. Defendant also alludes to the testimony of Rose Jolliff and Mary Ellen Lyner, characterizing it as unworthy of belief. Such arguments ignore the requirement that we review the evidence favorably to the verdict, as noted above.

■ It is sufficient to note defendant admitted to the police that she was present at the Vickers station on the night of the murder, close in time to when the murder was committed; she specifically admitted to Rose Jolliff and generally admitted to Mary Ellen Lyner that she committed the offense, along with Stanley White and Robert McIntosh; and both Stanley White and Robert McIntosh were identified as being at the scene of the crime around the time of the murder. There was certainly sufficient evidence for the case to go to the jury; the credibility of the witnesses was solely within the province of the jury. *State v. Armistead*, 655 S.W.2d 852, 853 (Mo.App.1983). Defendant's first point is denied.

In her second point, defendant alleges that she was denied due process of law because of the State's failure to disclose exculpatory evidence in its possession, in violation of defendant's constitutional rights. Defendant cites *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976) for this proposition. The evidence which is the focus of this claim involves an

alleged conversation between defendant and Stanley White, which took place on January 7, 1983 while defendant and White were in nearby cells, and which was tape-recorded without the knowledge of either party.[1] This argument was not before the trial court, nor is the evidence included in the record before this court.

■ Defendant first asserts that the evidence in question should have been disclosed in response to her trial counsel's request for disclosure: "(8) If there has been any photographic or electronic surveillance (including wiretapping), relating to the offense with which defendant is charged, of the defendant or of conversations to which the defendant was a party or of his premises, a summary and the identity of those making same." In its brief, the State does admit that a conversation took place between defendant and Stanley White, which was recorded. Although it would appear that this information should have been disclosed to the defense pursuant to Rule 25.03 (A)(8), absence of any indication in the record of the content of the conversation prevents our determination of whether the State's failure in this regard amounts to prosecutorial misconduct warranting reversal.

■ With regard to defendant's argument that the conversation should have been disclosed under the rules of *Brady* and *Agurs,* supra, we note that in both of these cases the character of the evidence in question was before the court. We decline to assume that the evidence herein was exculpatory in nature. We also decline to accept the State's assertion that the evidence had no value to either side. We are unable to pass on defendant's second point. The proper forum for the review of a constitutional issue not passed upon in a direct

appeal is a proceeding under Rule 27.26. *Pollard v. State,* 628 S.W.2d 430, 430 (Mo. App.1982).

In her third point, defendant claims the trial court erred in overruling her motion for new trial on the basis of the State's failure to disclose the full extent of promises made to witnesses Mary Ellen Lyner and Rose Jolliff, in violation of defendant's right to due process of law. Defendant's motion for new trial contends the State failed to disclose that it had agreed to quash additional unexecuted warrants against Mary Ellen Lyner in exchange for her testimony, and that Rose Jolliff was promised bench probation in exchange for her testimony. At the hearing on this motion, defendant argued only the issue of Jolliff's bench probation. No testimony, exhibits, or other evidence was offered by defendant at the hearing, therefore neither allegation was before the trial court. The prosecuting attorney denied making any promise to Jolliff in exchange for her testimony, and stated that Jolliff's sentence was what anyone else would have received with her charge and her background.

■ It is well settled that in a motion for new trial, factual allegations are not self-proving. *State v. Pence,* 428 S.W.2d 503, 506 (Mo.1968). Defendant cites *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972) for the proposition that it is reversible error for a prosecutor to fail to disclose a promise of consideration to a witness in exchange for testimony. Defendant supplements her brief with an appendix containing National Crime Information Computer printouts for Mary Ellen Lyner and Rose Jolliff. The information before this court, however, is insufficient for us to be able to properly address this point. The computer printouts are not

1. Defendant argues in her main brief that the State also failed to disclose a conversation between defendant and an undercover policewoman who was placed in a cell with defendant in an attempt to learn additional information. In her reply brief defendant admits that the episode and the contents of the conversation were revealed at the suppression hearing held on October 13, 1983. Defendant's appellate counsel explain their mistake by stating that they were not defendant's trial counsel, they had no communication with her trial counsel, and they did not know a suppression hearing had been held at the time the main brief was filed. We therefore do not discuss the claim regarding the undercover policewoman in our analysis of defendant's second point.

self-explanatory, and the cryptic language and abbreviations therein were not explained on the record before the trial court. As was said of these same printouts relating to witness Lyner in *State v. Reasonover*, 700 S.W.2d 178, 184 (Mo.App.1985), "assertions of fact not contained in the trial court record may not be considered by a reviewing court on direct appeal." Defendant acknowledges the insufficiency of the evidence on this point in her brief, when she requests that this court take the extraordinary action of remanding the case to the trial court for a hearing on the issue. We decline to do so.

In her fourth point, defendant asserts that the State knowingly presented false and misleading testimony which denied her due process. No trial court error is alleged as required by Rule 30.06(d). Review is requested under plain error. Rule 29.12(b). Defendant contends that statements made by Rose Jolliff in her initial interview with the police, contained in a police report, are inconsistent with and contradict her deposition and trial testimony. Defendant also contends that the testimony of Captain Daniel Chapman at a suppression hearing is inconsistent with and contradicts his trial testimony.

We observe initially that the police report containing the statements complained of was not before the trial court. Defendant notes that Jolliff verified this initial statement to the police in a deposition. However, neither Jolliff's deposition nor the transcript of the suppression hearing was before the trial court. The review of an appellate court is limited to the record made in the trial court, and other evidence may not be considered. *State v. Terry*, 676 S.W.2d 44, 46 (Mo.App.1984).

■ Assuming, without deciding, that the statements complained of are inconsistent, such inconsistent statements are not proof of perjury. *State v. Rollie*, 585 S.W.2d 78, 89 (Mo.App.1979). The inconsistency may affect the credibility of the witness, but does not prove the truth of the prior statement. *State v. Nimrod*, 484 S.W.2d 475, 479 (Mo.1972). Defendant

fails to establish that "the alleged perjured testimony was deliberately falsified, known by the prosecutor to be false and that the conviction was obtained as the result of such perjured testimony." *Rollie*, supra at 89. Where, as here, defense counsel has access to an inconsistent statement, it is not the burden of the State to elicit the inconsistency. *Link v. United States*, 230 F. Supp. 971, 972 (E.D.Mo.1964). In the present case, defendant's trial counsel were present at the suppression hearing and had access to both the police report and Jolliff's deposition. We note in addition that the State would not have been permitted to impeach its own witness unless it demonstrated that it was surprised by the inconsistent answer, *and* such answer made the witness a witness for the other side. *State v. Byrd*, 676 S.W.2d 494, 502 (Mo. banc 1984) (Emphasis added). Such is not the case here.

We have reviewed the record, and there is no evidence that the State knowingly presented any false or misleading evidence. Defendant's fourth point is denied.

In her fifth point, defendant contends that the trial court erred in overruling defendant's objection to an alleged admission made by defendant to Mary Ellen Lyner on February 9, 1983. The statement in question is: "Those mother-fuckers picked me out of a lineup. I told them we should have blew their brains out too."

■ Defendant argues that this statement had been used in a previous, separate trial, and violated an agreement with the prosecuting attorney that the statement would not be used in the trial of this case. The prosecuting attorney explained that the agreement related to an entirely different statement and that, in the previous trial, he did not elicit from witness Lyner the testimony that defendant stated, "I told them we should have blew their brains out too." In the earlier trial, which arose out of a crime committed by defendant approximately one month after the crime with which we are here concerned, Lyner testified that defendant said to her on the occasion in question that "those motherfuckers

picked me out of a lineup. I told him we should have blown their brains out." *State v. Reasonover*, 700 S.W.2d 178, 181 (Mo. App.1985). The prosecutor stated to the trial court that he had always maintained that defendant's use of the word "too" was relevant in the trial of this case. And so it was. From the statement, the jury could readily deduce that defendant had committed this murder in order to eliminate a witness to her criminal activity. A witness in Lyner's position may properly testify to the same matters at two separate trials involving two different crimes committed by a defendant, if the matters are relevant at both trials. *See State v. Kirksey*, 547 S.W.2d 149, 151 (Mo.App.1977).

■ Defendant's final argument on this point contends that because there was no identification of defendant by lineup in the present case, defendant's statement is inadmissible evidence of another crime. Although the general rule holds such evidence to be inadmissible, evidence of another crime is admissible to prove the crime charged when it tends to establish (1) motive; (2) intent; (3) the absence of mistake or accident; (4) the identity of the person charged with the crime; or (5) a common plan or scheme of two or more crimes so related to each other that proof of one tends to establish the other. *State v. Koster*, 684 S.W.2d 488, 490 (Mo.App.1984). As noted above, defendant's statement to Mary Ellen Lyner demonstrated defendant's motive for the murder of James Buckley. There was no error in the admission of this statement. Defendant's fifth point is denied.

■ Defendant's sixth point alleges trial court error in the overruling of defendant's objection to certain testimony of Captain Daniel Chapman. At the trial, defendant objected to Chapman's testimony on the grounds of relevancy and insufficient foundation. In her brief, defendant characterizes this testimony as inadmissible hearsay. An appellant is not permitted to broaden or change the basis or scope of an objection on appeal beyond that which was made in the trial court. *Ingle v. Illinois Central Gulf Railroad Company*, 608 S.W.2d 76, 80 (Mo.App.1980), *cert. denied*, 450 U.S. 916, 101 S.Ct. 1359, 67 L.Ed.2d 341 (1981); *State ex rel. State Highway Commission v. Yackel*, 445 S.W.2d 389, 390 (Mo.App.1969). We review the admission of Chapman's testimony for plain error. Rule 29.12(b).

■ Defendant argues the testimony objected to was hearsay because Captain Chapman was testifying about a police report he did not prepare, nor have personal knowledge of. We have reviewed the record, and find that the testimony objected to concerns what defendant told Chapman in response to his questioning, and not the contents of the police report as such.

■ Returning to defendant's original trial court objection of relevancy, the statements made by defendant to Chapman were properly received by the trial court as admissions. Defendant admitted to Chapman that she knew Stanley White and described his automobile. There was evidence both White and such a car had been at the scene of the murder. Statements made by a defendant which tend to connect him with the crime are admissible when voluntarily made. *State v. Thresher*, 350 S.W.2d 1, 9 (Mo.1961); *State v. Hardin*, 558 S.W.2d 804, 808 (Mo.App.1977). Defendant's sixth point is denied.

Defendant's seventh point alleges trial court error in the admission of defendant's statements to Detective Dennis Welling. Because these statements were not objected to at trial, and were not mentioned in defendant's motion for new trial, we are asked to review their admission for plain error. Rule 29.12(b).

Specifically, defendant argues the statements made by her on January 7, 1983 from approximately 11:30 a.m. to 1 p.m. were inadmissible on the grounds she had not received a *Miranda* warning.[2] In

---

2. We note that the trial judge was not aware of the facts underlying the *Miranda* claim, and

thus it was impossible for him to have acted sua sponte to prohibit the testimony in question,

these statements defendant was asked to detail her whereabouts for the period December 31, 1982 to January 3, 1983. Detective Welling testified that defendant was asked about six times for the sequence of events and only once, as an afterthought, did defendant state that she had been at the Vickers station early in the morning of January 2. ·

*Miranda* rights are required to be given before questioning a person who "has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Miranda v. Arizona*, 384 U.S. 436, 444; 86 S.Ct. 1602, 1612; 16 L.Ed.2d 694, 706 (1966). *Miranda* protects only against the use of statements arising from custodial interrogation without use of procedural safeguards. *State v. Overstreet*, 551 S.W.2d 621, 628 (Mo.1977). "[R]esponses to precustodial inquiries are not inadmissible because of a failure to give *Miranda* warnings." *State v. Parker*, 543 S.W.2d 236, 240 (Mo.App.1976). Custodial interrogation does not exist if the person questioned is not in custody because he is not a suspect, or, even if he is considered a suspect, when he is not under arrest or otherwise restrained of his liberty. *State v. Greathouse*, 627 S.W.2d 592, 594 (Mo. 1982).

■ In the case at bar, the evidence shows Ellen Reasonover initiated the contact with the police and had been coming voluntarily to the police station on a daily basis from January 3 to January 7 ostensibly to assist the police in their investigation of the Buckley murder. She was free to leave the police station at anytime prior to her arrest at 1:00 p.m. on January 7, 1983. She had been coming to the Dellwood police station of her own free will for the previous four days. She was arrested at 1:00 p.m. on January 7, shortly after the police learned that she had failed a modified polygraph test which she had voluntarily taken. In our review for plain error, we find nothing in the record to indicate

that, during the questioning which took place prior to her arrest, defendant was deprived of her liberty in any significant way. *Miranda* warnings were therefore not required. Defendant's seventh point is denied.

In her eighth point, defendant argues that the trial court committed plain error in permitting the testimony of Rose Jolliff concerning admissions made by defendant to Jolliff, as these admissions were the fruit of an illegal arrest, in violation of defendant's right to due process. No objection to Jolliff's testimony on this basis was made at trial nor was the issue preserved in the motion for new trial. Defendant essentially states that the information available to the police at the time of her arrest at 1:00 p.m. on January 7, 1983, was insufficient to establish probable cause to arrest. She further contends that the sole purpose for her arrest was to "place Appellant in a position to be informed upon." At 10:00 p.m. on the day she was arrested, defendant was transported from the Dellwood jail to the Jennings jail, where she was placed in a cell with Rose Jolliff and Marquita Butler. Defendant was released the following morning, January 8, 1983. It was during this time period that defendant admitted to Jolliff that she had committed the Vickers murder-robbery along with Stanley White and Robert McIntosh.

■ The test for a lawful arrest is whether probable cause exists regardless of whether the arrest was made with a warrant. *State v. Kroll*, 682 S.W.2d 78, 82 (Mo.App.1984). Probable cause requires "knowledge of facts and circumstances sufficient for a prudent person to believe the suspect is committing or has committed an offense." *Id.; State v. Smith*, 681 S.W.2d 518, 521 (Mo.App.1984). The existence of probable cause is not determined through the hindsight of legal technicians, but rather through the practical considerations of everyday life upon which reasonable people

---

absent an objection from trial counsel which would have brought the issue to his attention. The suppression hearing was held by a different

judge, and it was this judge who ruled on defendant's motion to suppress statements.

act. *Kroll,* supra; *State v. Fain,* 679 S.W.2d 419, 423 (Mo.App.1984). In determining whether there is sufficient justification for an arrest, all the information in the possession of the police and the reasonable inferences that can be drawn therefrom are to be considered. *State v. Stokes,* 710 S.W.2d 424, 426 (Mo.App.E.D.1986); *State v. Wiley,* 522 S.W.2d 281, 287 (Mo. banc 1975). It is not necessary that the information rise to the level of that which would be necessary to sustain a conviction; it need only be such as would cause a reasonably prudent person to form a belief. *Smith,* supra; *Stokes,* supra.

 In the present case, prior to defendant's arrest the police were aware of a number of facts pointing to her involvement in the crime. Upon her initial contact with the police, defendant volunteered the information that she had been present at the Vickers station at or about the time of the murder. The police were aware of discrepancies between what defendant had told them and what she had told her mother. Defendant had positively identified the photographs of two men whom she claimed she had seen at the Vickers station, both of whom had been incarcerated in the workhouse at the time of the murder. She subsequently identified a third man, Willie Love. Willie Love passed a stress test, and his alibi checked out. Stanley White had been tentatively identified as being at the Vickers station on the night of the murder. The police were aware that defendant associated with Stanley White through statements she made during the course of her contact with the police. A few days before the murder, defendant reported to the police that Stanley White had broken out the windows of her car, and gave a description of the car he was driving, which was remarkably similar to the car she described as being at the Vickers station on the night of the murder. Stanley White's alibi failed to check out. Defendant failed a stress test. When she was questioned by the police on January 7, 1983, about her activities during the several days prior to and subsequent to the murder, defendant failed to mention, except once as an afterthought, that she had been at the laundromat or Vickers station on the night of the murder, which was the information which caused her to come forward initially. The police were also aware that defendant had previously been arrested for a robbery at a Vickers station where she had worked in 1978. In our review for plain error, we find that at the time of her arrest, a prudent person reasonably could have believed that defendant had participated in the crime. Defendant's eighth point is denied.

In her ninth point, defendant argues that the trial court committed plain error in permitting in evidence statements made by defendant to police officers on February 25, 1983, in violation of her right to counsel under the Sixth and Fourteenth Amendments. On February 25, 1983, defendant was in a holding area of the St. Louis County jail. She had attended a bond hearing on an unrelated charge against her and had been represented at the hearing by counsel. This was the same counsel who ultimately represented her on the charge in the present case. Two police officers took her from this holding area into another room, where they read her *Miranda* rights to her, served her the warrant on the present murder charge, and asked her if she wanted to talk about her involvement in the murder. Defendant said she understood her rights. In response to the police questioning, defendant stated that she would not "come in on" Stanley White, Stanley White would not "come in on" her, and that she wasn't involved in the murder. She then refused to talk further to the police and they returned her to the holding area. Testimony concerning this occurrence was elicited from the police officers without objection from the defendant who now argues that the trial court should have suppressed such evidence *sua sponte.* We review under plain error. Rule 29.12(b).

 The Sixth Amendment right to counsel is separate and distinct from the Fifth Amendment right to counsel. The latter is a procedural safeguard to ensure the protection of an individual's right

against self-incrimination. *State v. Beck,* 687 S.W.2d 155, ·156, n.1 (Mo. banc 1985). The Sixth Amendment right to counsel attaches upon the initiation of adversary judicial proceedings against an individual. *Beck,* supra, at 159–160. Such adversary judicial proceedings include a formal charge, preliminary hearing, indictment, information, or arraignment. *Beck,* supra, at 160. While defendant's Sixth Amendment right to counsel may have attached with regard to the unrelated charge, such is not the case with regard to the murder charge presently before us. An arrest warrant in and of itself does not constitute the initiation of adversary judicial proceedings. *Beck,* supra.

■■■ Defendant's assertion of her Sixth Amendment right to counsel in a separate, unrelated criminal case does not automatically equate with an assertion of her right to counsel for all other offenses for which she may be questioned. Defendant has cited no cases which so hold. We note that our Supreme Court, as recently as 1985, has declined to consider the question of whether a defendant's counsel on an unrelated charge is to be considered his or her "general counsel" for every other legal problem that the defendant may have. *Beck,* supra, at 157, n. 5. We also decline to address this question. Since defendant's Sixth Amendment right to counsel in the present case had not attached at the time of the questioning, the issue whether this right was violated is moot. *Beck,* supra, at 159–160.

■■■ The only right to counsel available to defendant with respect to this case on February 25, 1983 was her Fifth Amendment right to counsel. However, defendant did not request counsel. In the absence of a request for counsel, it is proper for the police to question a defendant about a crime other than one upon which he has representation where *Miranda* warnings have been given. *See State v. Blair,* 638 S.W.2d 739, 748–749 (Mo. banc 1982), *cert. denied,* 459 U.S. 1188, 103 S.Ct. 838, 74 L.Ed.2d 1030, *reh'g denied,* 459 U.S. 1229,

103 S.Ct. 1240, 75 L.Ed.2d 472 (1983). Defendant's ninth point is denied.

In her tenth point, defendant contends that the trial court committed plain error in allowing the prosecutor to "testify," through his use of leading questions, regarding his involvement in the investigation of the case. Defendant claims that, since she could not cross examine the prosecutor, she was effectively deprived of her Sixth Amendment right to confront an adverse witness (the prosecutor).

Some examples of the type of questions defendant refers to are as follows:

Q. [Prosecuting Attorney] Now, on February the 25th did you make any other effort to try to obtain a statement from Ellen Reasonover?

A. [Dellwood Police Captain Chapman] I tried to obtain a statement.

Q. Did I suggest anything?

A. Yes sir. You suggested that we take an undercover police woman and put her in a cell with Ellen Reasonover in an attempt to learn some information.

\* \* \* \* \* \*

Q. [Prosecuting Attorney] At that point did I ask you if you would be willing to testify?

A. [Mary Ellen Lyner] Yes.

Q. And did I give you, in exchange for your testimony, the promise of one year in jail on your charges?

A. Yes.

Q. Or at least we would make that recommendation to the court, is all we could do?

A. That's right.

Q. Did I also tell you, when I found out you had a check charge in the City, we would recommend that would be one year concurrent on that?

A. Yes.

Q. And I believe that was done the same time?

A. It was.

■■■ With respect to the argument that defendant was denied the right to cross examine the prosecutor, we simply note that no effort was made by the de-

fense to call the prosecutor to the stand and examine him as a hostile witness. More basically, however, our examination of the record shows that, although the prosecutor was consistently blatant in his use of leading questions, defense counsel made no objection to any question on such ground. Even where a leading question is asked and an appropriate objection is made, a trial court may permit the question to be answered; and, absent an abuse of discretion, the ruling will not constitute reversible error. *State v. Myers*, 538 S.W.2d 892, 896–897 (Mo.App.1976). Here, defendant asks us to rule that the trial court committed reversible error in not intervening *sua sponte* to limit the prosecutor's use of leading questions. We decline to do so. A trial judge need not be more solicitous of a defendant's rights than defendant's own counsel, who may decline to object for some reason related to his trial strategy. Point denied.

 In her eleventh point, defendant alleges the trial court erred in overruling defendant's motion to suppress the identifications of co-actors Stanley White and Robert McIntosh.[3] Defendant contends that the identification process was so impermissibly suggestive and conducive to mistaken identification as to be fundamentally unfair to defendant. There was no objection at trial to the testimony of State's witness Kenneth Main regarding his out-of-court identification of Stanley White, nor was there an objection to the testimony of State's witness Anthony Longo regarding his out-of-court identification of Robert McIntosh. In addition, the composites of White and McIntosh prepared by Main and Longo, and the photographs of the lineups during which Main and Longo identified White and McIntosh, were admitted into evidence after defense counsel expressly stated there was no objection to the admis-

sion. Evidence that is the subject of a motion in limine must be objected to at trial. *State v. Allbritton*, 660 S.W.2d 322, 328 (Mo.App.1983). Consequently, our review is limited to plain error. Rule 29.-12(b).

We first address the identification of Stanley White by State's witness Kenneth Main. Main testified that he was present at the Vickers station at about 1:45 a.m. on the night of the murder, and observed the victim listening to a black man who was leaning on a counter in the station. Main helped prepare a composite of this man. He also picked out photographs of several individuals whom he felt somewhat resembled the man he had seen, but failed to identify these men in subsequent lineups. On January 6, 1983, Main viewed a lineup containing Stanley White. With regard to this lineup, Main prepared and signed a statement which stated: "Number 1 and 2 were not the men I saw at Vicker's. I remember the man having a tall lean build, like suspect 4. Number 3's face somehow reminds me of the man I saw, but I can't be sure. Number 4's build reminds me of the man I saw and his profile reminds me of the man, but I only glanced at him at Vicker's and I can't be sure it's him." Stanley White was the fourth man in the lineup. The next day, January 7, 1983, Main underwent hypnosis to help him recall the man he had seen at the Vickers station. After the hypnosis session was completed, Main asked to see the fourth man in the lineup again, this time leaning on a counter. He then positively identified the fourth man, Stanley White, as the man he had seen.

 Defendant contends that Kenneth Main's identification of Stanley White was tainted in three ways. She first con-

---

**3.** Defendant's motion to suppress identification asks for the suppression of "any and all testimony ... with regard to the out-of-court identification of the defendant." We note that defendant was never independently identified as being at the Vickers station in the present case, but was placed at the crime scene through her statements to the police. On appeal, defendant chal-

lenges the identifications of her co-actors, thus her motion preserves nothing for review. Defendant's brief also refers to a motion in limine to exclude the identification testimony of Kenneth Main on the basis that it was unreliable because of Main's undergoing hypnosis. If indeed this was a separate motion, it is not included in the legal file.

tends that the composition of the lineup containing Stanley White tainted the identification because it "was not composed of similar types but individuals grossly disimilar [sic] in appearance as to height, skin coloring, weight and features." A dissimilarity in the physical characteristics of individuals comprising a lineup is alone not sufficient to establish impermissible suggestiveness. *State v. Burns,* 671 S.W.2d 306, 310 (Mo.App.1984). In the present case Main had helped prepare a composite drawing and had looked at other photographs and lineups prior to the lineup containing Stanley White. Together with the other circumstances surrounding Kenneth Main's identification of Stanley White, discussed infra, we fail to find the lineup containing White unfair.

■ Defendant next contends that Kenneth Main heard a tape-recorded conversation between defendant and Stanley White which tainted his identification of White by establishing a relationship between the suspects. Although the State in its brief admits to the existence of the tape and the fact that Main heard it, neither the tape nor any issue involving it was before the trial court, thus there is no record upon which we may base a review of this issue. Furthermore, there is nothing before us to indicate the voice of the man on the tape, the fourth man in the lineup, and Stanley White were ever identified to Kenneth Main as one and the same. Nor is there any indication as to when Main heard the taped conversation, although presumably it was sometime on January 7, 1983, when the conversation was supposed to have occurred. In the absence of any information regarding the circumstances surrounding Main's hearing of the tape, we decline to hold that Main's identification of Stanley White was tainted by his hearing the tape.

Defendant finally contends that Kenneth Main's post-hypnotic identification of Stanley White was tainted by the hypnosis session, which was impermissibly suggestive. At trial, defense counsel cross examined Main about the hypnosis session. Defense counsel also called an expert witness, Dr.

Theodis M. Wheatt, to testify to the general view among psychiatrists that hypnosis is not reliable as an aid to memory recall. At a hearing on defendant's motion for new trial, held January 11, 1984, defense counsel orally objected to the post-hypnotic testimony of Kenneth Main based on the general lack of scientific support for hypnosis as a procedure for memory recall, and the possibility of suggestion. Trial of this case took place from November 28 to December 3, 1983. At that time *State v. Greer,* 609 S.W.2d 423 (Mo.App.1980), *vacated on other grounds,* 450 U.S. 1027, 101 S.Ct. 1735, 68 L.Ed.2d 222 (1981), which held post-hypnotic testimony to be admissible, absent a showing of impermissible suggestiveness, was the law in Missouri.

■ On November 21, 1985, in *Alsbach v. Bader,* 700 S.W.2d 823 (Mo. banc 1985), the Missouri Supreme Court found post-hypnotic testimony lacked scientific support for its reliability, and therefore should not be admissible in Missouri courts. In *State v. Walker,* 616 S.W.2d 48 (Mo. banc 1981) the Missouri Supreme Court sets out the standards to be used in determining if a decision creating a new rule of law is to be applied retrospectively or prospectively, in the event the Supreme Court fails to so indicate in the opinion. This determination is dependent on whether the new rule of law is characterized as procedural or substantive. *Walker,* supra, at 49. Rules of evidence are generally considered to be procedural in nature. *Id.* In *Walker,* the Court applied the rule of *State v. Biddle,* 599 S.W.2d 182 (Mo. banc 1980) prospectively. *Biddle* held polygraph evidence to be inadmissible in criminal trials regardless of whether the parties voluntarily stipulated to its admissibility. *Walker* treated *Biddle* as a change in an evidentiary rule. *Walker,* supra, at 49. As in *Biddle,* the new rule in *Alsbach* deals with the admissibility of evidence. We also note that the Court in *Alsbach* frequently cited *Biddle* as a parallel in its analysis of the hypnosis issue. *Alsbach,* supra, at 828–830. Thus, the rule in *Alsbach* is to be applied prospectively only. There was no error in the

admission of the post-hypnotic testimony of Kenneth Main because such was properly admissible under the rules of evidence and case law at the time of defendant's trial.

We next consider defendant's contention that the hypnotic process undergone by Kenneth Main was impermissibly suggestive. The "procedural safeguards" against impermissible suggestiveness which were summarized in *Alsbach,* supra, at 826, were substantially complied with in the instant case. The hypnotic session was conducted by Dr. Jon Tek Lum, a psychiatrist trained in the use of hypnosis. Although Detective Pruett was present while Dr. Lum questioned Main, he was not present while Main was being placed in an hypnotic trance, he sat to the rear of Main, and did not participate in the questioning. Dr. Lum was given very few details about the investigation, and was never given a description of Stanley White or any of the other suspects. The hypnotic interview was tape-recorded, and defense counsel had access to a transcript of the tape. Finally, Main's identification of Stanley White was corroborated in several ways. Main helped prepare a composite of the man he had seen at the Vickers station before he was placed under hypnosis. Also prior to the hypnosis, Main tentatively identified White in a lineup. Main focused on not only White's height and build, but also on his profile. After the hypnosis, it was the viewing of White's profile as White leaned down on a counter in a position similar to the man at the Vickers station which made Main certain in his identification. After undergoing hypnosis, Main recalled that a Mazda automobile drove into the station as he was leaving. This was verified at trial through witness Jim Abernathy, who testified he was at the Vickers station on the night of the murder, and was driving a blue Mazda G–L–C. In addition to this corroboration, defendant's own expert witness, Dr. Wheatt, testified that although a particular question may have been asked in better form, the transcript of the hypnotic session as a whole was not suggestive. There was no error in the admission of Main's identification testimony, plain or otherwise.

We next address the identification of Robert McIntosh by State's witness Anthony Longo. Defendant argues, under plain error, that because three months had elapsed between the date of the murder and Longo's identification of McIntosh, the identification is tainted. Defendant's point has no merit. Longo identified McIntosh on March 4, 1983, two months after the crime, and not three months after the crime as defendant asserts. A two month time span between a crime and a lineup is not significant in itself so as to undermine an identification procedure. *See State v. Haymon,* 639 S.W.2d 843, 845 (Mo.App.1982). Other circumstances surrounding the identification establish its reliability. Longo got a good look at the man's face, he gave a detailed description and prepared a composite within twenty-four hours of the crime, the Vickers station was well lit, and Longo was very certain in his identification. There is no manifest injustice in Anthony Longo's identification of Robert McIntosh.

Defendant's final argument under point eleven asserts that the trial court erred in allowing the identifications of co-actors Stanley White and Robert McIntosh because the identifications were irrelevant, and allowed the jury to infer their guilt, to defendant's prejudice. Proof of all relevant facts is generally proper where two or more persons have engaged in the commission of a crime. *State v. Ward,* 457 S.W.2d 701, 708 (Mo.1970). In the present case there was absolutely no evidence before the jury that Stanley White or Robert McIntosh had ever been charged with or found guilty of the Vickers murder, but the evidence connecting these men with defendant Ellen Reasonover was highly relevant, and corroborated the admissions defendant made to Rose Jolliff. Under our review for plain error, we decline to find a miscarriage of justice. Defendant's eleventh point is denied.

In her twelfth point, defendant argues that the trial court denied due process to her by refusing her request for a contin-

uance, and requiring her counsel to conduct voir dire at 7:00 p.m. on the first day of trial. Voir dire proceedings are conducted under the supervision of the trial court. *State v. Lumsden*, 589 S.W.2d 226, 229 (Mo. banc 1979), *cert. denied*, 446 U.S. 984, 100 S.Ct. 2967, 64 L.Ed.2d 841 (1980). The discretion of the trial court regarding such proceedings will not be overturned on appeal absent a showing of manifest abuse of that discretion. *Id.*

The record before us reflects that defendant's voir dire examination began at 6:31 p.m., and not at 7:00 p.m., as asserted on appeal. The State's voir dire began shortly after 2:00 p.m. and concluded at 5:20 p.m. Defendant's counsel objected, out of the hearing of the venirepersons, to proceeding with the defendant's voir dire at that point, contending that inconvenience caused by the late hours would cause the jurors to become prejudiced against his client. The trial judge informed counsel that the request would be denied and then announced to the panel that "because of a number of very important reasons, *the Court has concluded* that the voir dire examination of the jury panel must be concluded this evening." He then declared a one hour recess, suggesting that the panelists use the time to make telephone calls, "obtain a cup of coffee or any kind of

nourishment you might like." As stated, defendant's voir dire started at 6:31 p.m. and ended at 7:15 p.m. No complaint is made that defense counsel was unduly limited in his questioning of panelists by time or other constraints; and, indeed, no such complaint could reasonably be made. The record shows that, during the prosecutor's voir dire, defense counsel was allowed to interrogate various panelists at length to clarify and expand on answers they had given to the prosecutor. In view of the fact that the trial judge made it very clear to the panelists that it was his decision, and not that of defense counsel, to continue into the early evening hours, we perceive no possibility of prejudice to defendant. For a court to remain in session until 7:15 p.m., after an appropriate recess for telephone calls and refreshment, certainly does not constitute a "manifest" abuse of the discretion a trial court has in supervising voir dire examinations. *State v. Lumsden,* supra.

In her thirteenth point, defendant alleges trial court error in giving Instruction No. 10,[4] the verdict director for murder in the first degree, which was based on MAI–CR2d 15.12 and MAI–CR2d 2.12. Defendant raises two separate arguments as the bases for her contention: (1) MAI–CR2d

4. INSTRUCTION NO. 10

A person is responsible for his own conduct and he is also responsible for the conduct of other persons in committing an offense if he acts with them with the common purpose of committing that offense, or if, for the purpose of committing that offense, he aids or encourages the other persons in committing it.

As to Count II, you will consider in the alternative to Count I whether the defendant is guilty of murder in the first degree.

If you find and believe from the evidence beyond a reasonable doubt:

First, that on or about January 2, 1983, in the County of St. Louis, State of Missouri, the defendant or another caused the death of James Allan Buckley by shooting him, and

Second, that she or said other did so in robbing or attempting to rob James Allan Buckley,

then you are instructed that the offense of murder in the first degree under Count II has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Third, that with the purpose of promoting or furthering the commission of robbery in the second degree, the defendant acted together with said other person in committing that offense,

then you will find the defendant guilty under Count II of murder in the first degree.

However, if you do not find and believe from the evidence beyond a reasonable doubt each and all of the propositions submitted in this instruction, you must find the defendant not guilty of that offense.

A person forcibly steals, and thereby commits robbery, when in the course of stealing, he or another participant in the crime uses or threatens the immediate use of physical force upon another person for the purpose of:

(a) Preventing or overcoming resistance to the taking of the property or to the retention thereof immediately after the taking; or

(b) Compelling the owner of such property or another person to deliver up the property or to engage in other conduct which aids in the commission of the theft.

15.12 was improperly modified by MAI–CR2d 2.12; (2) Instruction No. 10 improperly referred to and defined robbery in the second degree.

■ With respect to defendant's first argument, it is true that the Notes on Use explicitly forbid the use of MAI–CR2d 2.12 (1983) in conjunction with first degree murder, referred to as felony-murder. MAI–CR2d 2.12, Notes on Use, Note 2 (1983). However, this court has held that the combination in question "has been implicitly approved by the Missouri Supreme Court, sitting en banc, in instances where there was party responsibility." *State v. Richardson,* 674 S.W.2d 161, 164 (Mo.App. 1984), *citing State v. Robinson,* 641 S.W.2d 423, 424–425 (Mo. banc 1982). Here the evidence shows that the defendant and other persons jointly committed the offense; MAI–CR2d 2.12 was used to modify the verdict director in the manner generally prescribed for this situation in the Notes on Use. *See* MAI–CR2d 2.12, Notes on Use, Note 6(b) (1983). There is nothing in the combination of MAI–CR2d 15.12 and MAI–CR2d 2.12 that would confuse or mislead the jury. *Richardson,* supra, at 164. We find no error.

■ We turn now to defendant's second argument in support of this point. Instruction No. 10, based on MAI–CR2d 15.12, which defines murder in the first degree in robbery, refers to the commission of "robbery in the second degree," and then goes on to describe "robbery," substantially using the definition of second degree robbery as found in MAI–CR2d 23.04. We initially note that Section 565.003, RSMo 1978 (repealed effective October 1, 1984) defining first degree murder, includes in its list of underlying felonies the term "robbery," not "robbery in the first degree," or "robbery in the second degree." *See State v. Holland,* 653 S.W.2d 670, 676–677 (Mo. banc 1983).

■ Finally, we note that in this point defendant claims error in the first degree murder verdict director, in spite of the fact that she was convicted of the greater offense of capital murder. As set forth in *State v. McIlvoy,* 629 S.W.2d 333, 340 (Mo. banc 1982):

> ... [T]here can be no reversible error in the giving of an instruction on a lesser grade of an offense when the jury has found the defendant guilty of a higher grade of that offense, unless an error exists in the former instruction which prevents the jury from convicting on the lesser grade.

No such error appears in the instruction. Defendant's thirteenth point is denied.

■ In her fourteenth point, defendant asserts that the trial court erred in refusing to give her requested instruction on circumstantial evidence, MAI–CR2d 3.42. It is not necessary for a trial court to give a circumstantial evidence instruction if there is any direct evidence of defendant's guilt, and an admission or declaration against interest is such evidence. *State v. Sherrill,* 657 S.W.2d 731, 738 (Mo.App. 1983); *State v. Neal,* 591 S.W.2d 178, 183 (Mo.App.1979).

In the present case defendant admitted to Rose Jolliff that she was the one who shot the attendant at the Vickers station and admitted more generally to Mary Ellen Lyner that she, along with others, was responsible for killing a man at the Vickers station. This is sufficient direct evidence of defendant's guilt, and negates the requirement of a circumstantial evidence instruction in this case. Defendant's fourteenth point is denied.

The judgment is affirmed.